THE UNITED STATES, PLAINTIFFS IN ERROR, *v.* SAMUEL W. DICKSON AND OTHERS, DEFENDANTS IN ERROR.

Samuel W. Dickson was appointed a Receiver of Public Money for the Choctaw district, Mississippi, and entered on the duties of his office on the 22d November, 1833, and continued to hold the office until the 26th July, 1836, when he resigned it. He received more than two hundred and fifty thousand dollars of public money, in each year, during the two years of his continuance in office; and, also, more than two hundred and fifty thousand dollars during the portion of the year commencing on the 22d November, 1835, and ending on the 26th July, 1836. He claimed, under the act of Congress relating to the compensation and salaries of receivers, a compensation of one per cent. on the sum of two hundred and fifty thousand dollars in each year; and also a commission of one per cent. on the money received during the fraction of the year, not exceeding, with the salary of five hundred dollars, three thousand dollars, in the fraction of the last year. The United States claimed to limit the commissions and salary to the fiscal year, from January 1, to December 31, annually; and denied his right to more than a portion of the commissions on the money received by him, limiting the same to the proportion of the year he was in office. Held, that the receiver was entitled to charge his commissions on the whole sum received by him in the part of the year he was in office; the same not exceeding, with his salary, the amount of three thousand dollars.

The receiver was entitled to calculate his yearly commission on the amount of public money received by him during a year, commencing from the date of his appointment, instead of calculating it by the fiscal year, which commences with the calendar year; on the first day of January in every year. He had a right to charge the whole yearly maximum of commissions, for the fractional portion of the year in which he resigned.

IN error to the Circuit Court of the United States for the Southern District of Mississippi.

Samuel W. Dickson, the defendant, was appointed by the President of the United States, Receiver of Public Money for the Choctaw district, in the state of Mississippi, and entered on the duties of his office on the 22d November, 1833, and retained the office, performing the duties thereof until the 26th July, 1836, having on that day resigned the same.

The United States claimed a large balance as due to them, and the defendant paid, in Natchez, the whole sum alleged to be due by him, with the exception of the items charged to him in the

treasury transcript, which were the subject of controversy in this case.

A suit was instituted by the United States on the official bond of Samuel W. Dickson, and his sureties, in May, 1839, in the District Court of the United States for the Southern District of Mississippi, in which the United States claimed certain sums of money received by Samuel W. Dickson, as Receiver, and not paid over to the United States. These sums were claimed by the defendant, and had been retained by him as his official compensation for the annual period of his service in the office, from the 22d November, 1833, and for the fraction of the last year in which he was in office, commencing on the 22d November, 1835, and ending on the 26th July, 1836; during which latter period he had received public money exceeding in amount two hundred and fifty thousand dollars.

On the trial of the cause the Court charged the jury, that the defendant Dickson was entitled to credit for three thousand dollars as compensation, including his salary of five hundred dollars for the year commencing November 22, 1833, and ending November 22, 1834; that he was entitled to the same compensation for the year commencing November 22, 1834, and ending November 22d, 1835; and for the fraction of the year between the 22d November, 1835, and the 26th July, 1836, he was entitled to two thousand five hundred dollars, commissions.

To this charge of the Court the United States excepted, and prosecuted this writ of error; a verdict and judgment for the defendants having been given, conformably to the opinion of this Court.

The case was argued by Mr. Birchard, and Mr. Gilpin, Attorney General, for the United States. No counsel appeared for the defendants,

Mr. Birchard, for the United States, contended that the Court erred,

1st. In allowing the Receiver to calculate his yearly commission on the amount of public money received in a calendar year, commencing with the date of his appointment, instead of the fiscal year fixed by law.

2d. In allowing the Receiver the whole yearly maximum of two thousand five hundred dollars of commissions for the fractional portion of the year in which he resigned.

In this case the accounting officers settled the accounts as is required by law, quarterly. The last quarter of each year terminating on the 31st day of December, annually.

The instruction given to the jury by the Court below, makes his first year commence on the 22d day of November, 1833, and end twelve months thereafter; and so of the succeeding years. The fractional period, which it treats as a full year, begins November 22d, 1835, and ends July 26th, 1836. It treats the terms used in the statute, "any one year," as any period of time, equal to twelve calendar months, whether it consists of portions of any two fiscal or calendar years. It disregards the beginning of quarters, weeks, or months, and has no reference to the accounting days by quarters, or the fiscal year established by law, and recognised by Congress, and the department from the first establishment of the treasury to the present time.

It is respectfully submitted that the entire legislation of Congress shows that the terms "any one year," when used in reference to the subject of accounting, import that portion of time intervening between the 1st day of January and 31st day of December; and that to give the phrase, as used in the act of 20th April, 1818, 3 Story, 1710, any other meaning, or such a meaning as will make it embrace any twelve consecutive months, composing parts of any two years, will subvert the design of Congress, introduce perplexity in accounts, and occasion great inconvenience, if it does not produce absurdities.

The act of 1818 is not an isolated piece of legislation, to be construed without reference to any other law. There are other statutes, so directly connected with the subject-matter, that they should be considered, if doubts may reasonably be entertained as to its true construction. It is but part and parcel of a code, and must be examined in reference to the system of laws, of which it forms a part, in order that from the whole a construction may be given to it, which will lead to no inconvenient results, or defeat the legislative will.

In Pennington v. Cox, 2 Cranch, 35, it was held, that the details of one part of a law or code may contain regulations

restricting or modifying the extent of a general expression used in another part of the same act, and that the whole should be taken into view for the purpose of discovering the mind of the legislature. And in Fisher et al. ads. The United States, 2 Cranch, 399, 400, Mr. Justice Washington, (in a dissenting opinion, but on this point agreeing with every member of the Court,) said, " that if, from a view of the whole law, or from other laws in pari materia, the evident intention is different from the literal import of the terms employed to express it in a particular part of the law, that intention should prevail, for that, in fact, is the will of the legislature."

" So, if the literal expressions of the law would lead to absurd, unjust, or inconvenient consequences, such a construction should be given as to avoid those consequences, if, from the purview of the law, and giving effect to the words used, it may fairly be done."

It is by these rules that I propose to test the correctness of the opinion of the Court below. By reference to the 6th sec. act of 10th May, 1800, 1 Story, 786, it will be seen that Receivers were required to render quarterly accounts to the Secretary of the Treasury. That they were appointed not for a term of years, but during good behaviour, or the pleasure of the President for the time being, and that they were entitled to a commission of one per cent. on the moneys received. The act of March 26, 1804, 2 Story, 932, sec. 14, gave them a salary of five hundred dollars, and a half of one per cent. in addition. The law of compensation thus stood until 1818, when the act in question was passed. At this period all the operations of the government were well understood. The departments were formed, the days of rendering and settling accounts were established and known. The act of 1817, 3 Story, 1632, sec. 13, was in force, making it the duty of the Secretary of the Treasury to cause all the accounts of his department to be settled within the year. The accounting days had been established for more than a quarter of a century, dividing each year into four quarters, and commencing and terminating the fiscal year on the first day of January, and the 31st of December. There has been no innovation on the part of the Executive or Congress, in this respect, since the formation of the government.

Looking at the object to be accomplished by the act of 1818,

can it be supposed that the term "any one year" was ever intended to be so understood as to embrace any other period than that established by usage and recognised by all the laws—any other than the well known days—the four fixed quarters constituting a year? At each of which the Receiver was required to render complete accounts, with the vouchers necessary to a prompt settlement. Especially when we reflect, that these settlements were to pass at the close of the year from the Auditor and Comptroller to the Register of the Treasury, there with the vouchers forever to remain as a finished piece of business. That the balances were to be certified to the Secretary of the Treasury as the basis of the future action of himself and Congress; and that certified copies from the Register were made evidence in all legal proceedings. The laws evidently, as well as the law makers, contemplated, at that date, that the four quarters of any one year would constitute the entire account of that year, and that the accounts of any two years could not be blended together without a violation of the legislative will. Such a thing as beginning or terminating an annual or quarterly account in the middle of a quarter, a month, or a week, (except at the commencement or termination of office, when it arose ex necessitate,) was then, as now, alike unknown to the department and the laws, and would effectually break in upon that simplicity and order of keeping accounts, which has been wisely, and for necessary purposes, established for more than half a century.

If, then, the terms of the act of 1818 were of doubtful import, might it not be claimed, that an exposition contemporaneous with the law itself, and always uniform, is strong, if not conclusive evidence of its own correctness? May it not be claimed with propriety, that in all their enactments, touching the subject of accounts, Congress have legislated in express reference to the existence of this principle as a fundamental one? If so, the rule is conclusive. It seems to me, there is no doubt upon the point. Yet I will not press it further than to observe, that it behooves us to be cautious in the inquiry, whether inadvertently or intentionally a special innovation has been introduced by this act.

It is contended that the act may receive such a construction as will harmonize with the laws and usages upon the subject of accounts, fully effect the object of its framers, and give to each and

every sentence its appropriate meaning, without the least violence to the language employed.

To do this, it must be examined here as it has been by the several eminent lawyers who, at various periods, have presided in the general land office and treasury department, all of whom adopted the rule which was applied in settling this account, and all of whose settlements are erroneous, if the Court below was not in error. In 1818, no such thing as a term of years for the office of a Receiver of public money was known to the law. The 1st section of the act of May 18, 1820, 3 Story, 1790, first limited the office to the term of four years, and the same act, in the second section employs words limiting and defining the word year, as there used, so as to clearly distinguish it from the accounting year. No aid in construing the act of 1818 can be derived from this posterior law. We must look to the state of things existing at the time of its passage, for what it meant then it means now. It is evident that the amount of one and a half per cent. had become exorbitant at some offices, owing to the increase and irregularity of land sales, and that the object was to limit the expenses of each office to a fixed sum per annum. It is manifest that Congress considered six thousand dollars a year an adequate compensation to both Register and Receiver; that let the business be more or less at any office, in any one year, this sum out of the public treasury was considered enough to pay for all the services which the two officers would be able to bestow upon one set of plats and books. And that, if little business was to be done, a less sum would be ample pay for it. Hence, a salary of five hundred dollars per annum was appropriated for each office, and five thousand dollars limited as the maximum commissions for both offices. This sum is all that the law designed to appropriate, and this is not given absolutely, but only upon condition that the receipts of the office should be such as to entitle the officers to the sum of three thousand dollars each. Nothing can be found in the old mischief or the new remedy; nothing in the title or text of the act to induce the belief that any change in the time, the manner and form of rendering and closing accounts was designed. The terms of the law are such that they could have been literally complied with, without preventing the final adjustments required to be made yearly by the

act of 1817, sec. 13, and the then existing Treasury regulation. Any one year naturally imports the fiscal and calendar year. It is tortured into an unnatural meaning, unknown to the common acceptation of the words, if made to embrace parts of different years.

But for argument sake, let it be admitted that the construction, which stood unshaken till 1837, is erroneous; that according to the judicial term "any one year" does not, as in the common acceptation, import the fiscal and calendar year, known to the laws and the almanacks; that an entire thing may be composed of different portions of entirely different things, and still retain its identity, and let us trace the consequences which must follow. If the path remains plain, free from perplexity and confusion, then construction may prevail without public detriment, and without resulting in embarrassment or absurdity.

There are seventy land offices, each having a Register and Receiver, who are bound to return their accounts quarterly, on the last days of March, June, September, and December, annually, with the vouchers necessary to a prompt settlement. These accounts, the Commissioner of the general land office is obliged to settle and pass over to the first Comptroller, who revises and approves them; reports the result to the Secretary of the Treasury; and then files them with the Register of the Treasury. At this stage of the business, the law supposes the work to be finished. In making the settlement the accounting officer is required to ascertain the money brought into the Treasury during the year, and to allow the Register and Receiver each a commission of one per cent. thereon, if the sum does not exceed two thousand five hundred dollars. With four accounting days, at stated periods, the work is simple and produces no difficulty. Will it be equally so if the accounting days per annum are doubled? But doubling the number will not effect the object, for of the whole one hundred and forty officers, scarce any two will be found who entered upon duty on the same day. It must be trebled, giving twelve accounting days for each officer, four for the quarterly fiscal accounts required by law, four to give the data on which the Register's commission is to be computed, and four for that of the Receiver; and as to these last accounts, those of one officer will be no check upon those of the

other, because, from the nature of the case, both accounts will not cover the same period of time. Again, the result will often give to one officer commissions on the sales of a calendar year to the amount of five thousand dollars, while the other on the same sales will be entitled to but two thousand five hundred dollars, a thing which is manifestly against the spirit of the law. It is notorious, that in years past repeated sales within a year have been held at a newly opened land office, and that in the following year, the sales have been nominal only. The annual reports of the department show frequent cases where one quarter's receipts amount to near a million, and the receipts of the preceding year falls short of twenty thousand dollars; while a third year has net to the treasury over two hundred and fifty thousand dollars.

Try the rule of the Court below by the operations of such an office, supposing the Register to enter upon duty the 1st of January, and the Receiver on the 1st of May, for the year 1834; and that during the year 1834 no sales are had; that in March, 1835, a sale brings over three hundred thousand dollars, and in December, 1835, a second sale brings other three hundred thousand dollars; that in 1836, no sales are had, and the office is discontinued on the last day of December. In this case, the Register will have held office just three years, and under the rule of the Court, he could receive as commissions but two thousand five hundred dollars; it being the maximum upon the sales from 1st of January to 31st of December, 1835. The Receiver, however, who held office three months less, and performed only equal labour, would be allowed the maximum of two thousand five hundred dollars on the sales in March, 1835, as it would be within his first year; and also the maximum on the sale of December, 1835, as that would fall in his second year, from his entrance upon duty. I submit that Congress never contemplated such a result; and yet, under the rule of the Court, such cases would be of daily occurrence. It is doubted if a single officer can be found whose accounts have been settled since the year 1818, without varying greatly, possibly thousands, from what this rule would give.

[Here an account, settled by Justice M'Lean, was read, show-

ing the rule of adjustment in 1820, when he was Commissioner of the General Land Office, to be as contended for now.]

But the unequal results as to the officer is not the only objection. In the case put, and in all that can happen, it compels the accountant to blend the operations of different years together. Instead of an account being closed at the end of a year, as the law contemplates, the officer is compelled to keep it open, and often to overhaul a business which, in legal contemplation, is already settled. Thus, in the case put, the account of the Receiver, which the law looks upon as closed on the 31st of December, 1834, must be re-opened, and three-fourths of a year's commissions allowed in the first quarter of 1835. And the account for the year 1835 could not be closed at the end of that year, because out of the sums received, an allowance must be made to the Receiver for the year 1836, during which no sales were had. Instead of being provided with given data upon which to make his annual estimates, the Secretary of the Treasury, under such a plan of doing business, must ever act upon conjecture, and can never inform Congress, at the opening of, or during a session, of the actual state of the treasury; for he can never possess accurate data until near a year has elapsed from the day of the date of the officer's last appointment.

Could the department, with this rule in operation, ever form, at the close of the year, an estimate of the annual net receipts of such offices as New York, Philadelphia, Boston, Baltimore, and New Orleans, which would approximate accuracy by from ten to fifty thousand dollars? The list of officers is from ten to two hundred at each of those places, each of whose salary, or pay, is in like manner limited. It would be difficult, if not impossible. It would seem that the inconveniences which flow from the rule, and the apparent effect it will have in defeating the legislative intent to regulate and equalize the pay of Registers and Receivers, prove its unsoundness. More especially as by considering the words " quarter," " yearly," of the act of 1800, to mean fourth parts of the " any one year," mentioned in the act of 1818; and the phrase " any one year," to import simply the said four quarters, an easy and natural sense and meaning is allowed to each phrase; all vexation, confusion, and apparent inequality of emoluments is avoided, and perfect har-

N 2

mony is found to exist between this law and all others upon the subject of accounting.

Have the United States been prejudiced by the supposed error in this case ? A pro rata allowance of commissions from November 22d, 1833, to December 31st, as will be seen, has been allowed by the jury, although it does not appear that any sale was made, or money paid into the treasury during that time. This error, if it be one, is carried th ough the whole term of the Receiver, (Rec. 10, 11,) and deducts from the receipts of 1834 over twenty-seven hundred dollars.

2d. The Court erred in treating the fraction of two quarters and twenty-six days as a full year, and allowing therefor twenty-five hundred dollars, instead of fourteen hundred and twenty-eight dollars, the pro rata allowance. The receipts of this fractional year were two hundred and eighty-five thousand nine hundred and fifty-nine dollars. The receipts of the residue of the year were two hundred and forty-nine thousand nine hundred and thirty-seven dollars. The accounting officers allowed Dickson fourteen hundred and twenty-eight dollars, and to his successor, for the residue of the year, ten hundred and seventy-two dollars. The decision of the Court below gives all to Dickson, and leaves nothing for his successor, without taking double commissions out of the collections of that year.

Dickson resigned after serving half a year. Can he have all that Congress provided for keeping the office open for the year 1836 ; and shall his successor have nothing ? We must suppose that in 1818 Congress knew that land sales occurred at irregular periods; that money from this source was collected in unequal quantities; and that the accounts of each year would be settled separately. All this was notorious. It was well known that the footing of accounts on the 31st of December, would enable the accountant to adjust the commissions upon principles of equity as between different officers and the government. Can it be inferred that an innovation upon the fundamental principles of settling accounts was designed ? Can we presume that by implication, a door was meant to be opened, out of which public money was to flow, in the shape of land-office emoluments, at a greater rate for each office than six thousand dollars per annum ? The law does not, in direct terms, appropriate more; and the

Constitution prohibits the payment of what an act has not appropriated.  The money received for lands is public money. . The sole title of any officer to any part of it must be derived from the act.  That only gives him title by prescribing to the accountant the duty of making him an allowance, when he closes his yearly account.  If Mr. Dickson's fraction of a year will draw full pay, by what rule can any other man's fractional year be deprived of full pay ?  The cases have been frequent, in times past, and may be expected to be so in future, where a new office has realised to the amount of say three millions in a year, one per cent. of which, to each officer, makes an aggregate of sixty thousand dollars.

   Suppose a public land sale at some such office to take place each month in twelve, and each sale to amount to two hundred and fifty thousand dollars, and a new set of officers to be given for each month ; will each month not be a fractional year ? and wi'l not each fraction be as well entitled to the maximum of two hundred and fifty thousand dollars as Mr. Dickson's fraction ?  When any one year is thus multiplied into twelve years, the cost of the office per annum will be sixty-one instead of six thousand dollars ; and the manifest intention of the legislature will be defeated.  It will not do to say that this is an extreme case, for the substantial facts as supposed have often occurred in practice.  Let the rule of the Court below be forced upon the department, and it is powerless, and cannot prevent hereafter the results supposed.  The President must keep land offices supplied with officers.  He cannot force these officers to continue in service after they choose to resign.  He cannot refuse to sell lands when the laws direct a sale.  He is bound by oath to see all laws executed, and must employ the means given for that purpose.  Will it be wise to suppose that men having adverse pecuniary interests to be subserved by a contrary course, will hold themselves long to the guidance of a rule of conscience more fair than the one which this Court is to pronounce lawful ?  It is far more likely, that public officers will square their consciences to the morality of the rules judicially established.

   Is there any difficulty to prevent the application of a rule which will accomplish the object of Congress, in requiring annual settlements ?  Does not the whole of "any one year," as

well as the whole of any other object, comprise all its parts?
Does not the law contemplate that each land office has one
Receiver always, and never but one? Can it be doubted, that
the object of the act of 1818, was to limit the whole expenses
of an office to six thousand dollars per year? If there is no dif-
ficulty in discovering the answers, then why shall not practice
give efficacy to the law, and make it mean what its makers
meant? The general land office and the Comptroller have done
this. They found that Dixon had received and paid into the
Treasury in 1826, money sufficient to entitle him to the maximum
of commissions, and that his successor had also done the same
thing, and they allowed each his due proportion. They gave to
each what he earned, and broke down no rule in so doing, and
opened no door through which the nation may be plundered, or
the Treasury pillaged. In what was their error? Did they a
wrong?

It has been supposed, that the case of an officer, who should
be discontinued after three months' service, he having, in that
time, paid two hundred and fifty thousand dollars into the Trea-
sury, would be a case of hardship, and it has been asked, if the
Government would not be a gainer under the rule contended for,
if the successor, in the last three quarters, should make no sales,
and of consequence earn no commissions; or whether, to avoid
the supposed evil, the Government would give to the latter the
earnings of the former? To all this I have to observe, that in
examining the accounts as settled by the department, ever since
1818, I have never found any case of hardship of the kind. In
the case supposed, it would be easy to avoid all injustice, by
allowing to each man what he earned. The incumbent of the
first quarter of the year earned full commissions, therefore give
it to him. The incumbent for the last three quarters earned none,
and would of course neither claim or receive any. Each would
have his own, and the United States would retain nothing which
the law designed to bestow upon others. Thus, in Dixon's case,
if, for the half of the year 1836, he would claim the compensation
of the full year, and reverse the settlement of the department, he
should prove his case fully by showing to the Court that no other
officer earned any commissions during the same period. This
he did not do, and could not have done. Without this proof, the

presumption of law is that the accounts were properly and equitably adjusted. Such also is the fact.

Mr. Gilpin, the Attorney General, for the United States.

The very full examination of the questions connected with this case, by Mr. Birchard, the Solicitor of the Treasury, leaves little room for further remark. It may not, however, be useless to advert to the long settled system, which has prevailed, with manifest advantage of the public interest, and with no injustice, taking the whole system together, to individuals; and also to notice the unbroken series of laws which seem to establish its accordance with legislative intention. The points at issue, do not, in the present instance involve any considerable sum of money, but their settlement is extremely important in the keeping of the accounts at the Treasury. It is very desirable that all doubt in regard to them should be removed, and that a system, uniform in itself, and in accordance with the judicial interpretation of the law, should be at once, and generally, introduced into the Treasury Department, if that now existing be incorrect.

The compensation of all officers charged with the collection of the revenue, whether derived from the customs or the public lands, depends, not on a fixed salary, but on their receipts. It is graduated either by a commission on moneys collected, or by the amount of fees received. It depends, therefore, on their own accounts. These accounts must be examined and adjusted to fix their compensation.

The mode, therefore, of keeping and rendering them, should be such as to exhibit, with entire uniformity, and accordance of parts, the two things; the correct discharge of duty in collecting the public money, and the exact amount of compensation due therefor. For each of these objects are the accounts required. They should be so framed as to exhibit each, whenever they are adjusted. The rule adopted to effect this, and practised from the beginning of the government, has been to adjust the accounts of these officers on the first days of January, April, July, and October. If their term of office commenced on an intervening day, the first account was required to be adjusted, when the first of these days arrived; if it terminated between them, the account was settled for the fraction that elapsed between the last of those

days, and the end of the official term. For these regular periods, the accounts were rendered; the commissions, fees, and emoluments, during these, were returned and calculated; the compensation was adjusted and allowed according to them. In carrying out the system on these principles, the fiscal year has been invariably regarded as coincident with the calendar year, commencing on the first of January, and ending on the thirty-first of December.

In the case now before the Court, the Receiver was appointed to office on the 22d November, 1833, and held it until the 26th July, 1836. During his first year, according to the mode of settling his accounts at the Treasury, his official term was for the fraction intervening between the 22d November and the 31st December. It then extended through the years 1834 and 1835. It embraced the two quarters of 1836, to the 1st July, and the fractional period of the third quarter, up to the 26th of that month. The District Judge of Mississippi, has declared this adjustment to be at variance with the law, and has decided that the first year of the Receiver's official term was for twelve months, ending on the 22d November, 1834; the second ending on the same day of 1835; and that the interval between that day and the following 26th of July, is to be regarded as the fraction of his third official year.

It is obvious that the annual compensation, derived from commissions on moneys, or fees received during the year, may differ considerably, as it is calculated by one of these modes, or the other. It may differ in favour, or against the officer, according to the period of the year, at which the moneys or fees are received. Neither the one mode, nor the other, however, will operate uniformly for, or against the officer; that depends on the amount and period of the receipts, taken in connection with the time his official term began. The propriety, therefore, of the regulation of the Treasury Department, as compared with that now established by the District Judge, is not to be tested by its effect to increase or diminish the amount of an officer's compensation. Whatever mode this Court shall direct henceforth to be pursued, it will not, by so doing, augment or diminish the average compensation. It may lessen or increase it in a particular case, accordingly as greater or less sums of money happen to be

received at a particular period, but the general result of either plan, will not be to give, on the average, either greater or less compensation.

Is it a matter of equal indifference, as regards the fiscal operations of the Treasury? "Will the public accounts be kept with the same uniformity, simplicity, and accordance with the views of the legislature, if the annual term—the "year" of the officer —is made to commence and end with the day of his appointment, in each successive year."

Such a regulation will be attended with manifest public inconvenience, and it is contrary to the whole scope of legislative enactments.

1. The invariable practice of the government has been to make the compensation of its officers, annual; to allow them a certain sum "for the year." Not less invariable has been its practice to require that their accounts of the moneys they collect, shall be rendered "quarterly;" that is for every three months. When the amount of annual compensation is made to depend on the amount of money collected, it must be ascertained from these accounts. Hence it follows, as a necessary consequence, that the accounts must be for periods corresponding with the periods of compensation. If the period of compensation be irregular, and governed by each particular case, the accounts must be equally irregular; they must be made up for the period of compensation, since the compensation depends upon them. It will thus be seen, that if the year is to be such as is designated by the District Judge, there must be a settlement of the accounts when it expires; and this at the end of each year throughout the term of the officer. If the quarterly accounts are to agree with this year, then are they equally irregular; but if not, then must there be a division in the account of that quarter, in every year when the annual term expires; or there must be kept two sets of accounts, embracing exactly the same items of moneys collected, but closing at different days, by one of which, the commissions are to be ascertained, and, by the other, the general fiscal duties. Could any thing lead to greater confusion, and irregularity, than such a system as this? Yet it cannot be obviated, if the fiscal year is to be made to vary with the appointment of the officer.

It cannot be said that the accounts may be kept, according to the usual system, throughout the term of office, and then adjusted for the fraction of the closing quarter. This plan will not accord with the law. The law says the officer is to receive a commission for collections "during the year;" that year is either the one beginning with the date of his appointment, or it is the fiscal year heretofore adopted at the Treasury. They cannot be blended during the term. Take the case of the defendant. He is entitled to all the commissions he receives in each year, provided they do not exceed two thousand five hundred dollars. Suppose that the commissions up to the 22d November, 1834, amount to that sum; will he not require that the account should be then adjusted and closed? Must it not be so; or, if not, does it not become necessary to dissect informally one of the q iarterly accounts of every year? At the end of his term he will demand that the amount of his commissions shall be made apparent in each year of his term; and this can only be done by a revision of the whole series of accounts, and a re-adjustment of what has been once settled; a revision and re-adjustment not only fraught with inconvenience, but directly contrary to that provision of law which requires the settlement of accounts quarterly, and their deposit with the Register, so as to constitute an unalterable and permanent record.

But the inconvenience does not end here. It is well known that the compensation of different officers may depend on commissions upon the same sums of money collected. Thus, the Register and the Receiver are entitled to commissions on the same sums of money collected at the land offices; the Collectors, Naval Officers, and Surveyors are entitled to fees on the same entries at the custom houses. The accounts, therefore, of the moneys so received should correspond; they are thus a check upon each other, and they obviate a multiplicity of accounts. Yet how can this be accomplished, if the annual terms of each of these officers are made to differ entirely from those of the others, by commencing with the day of their appointment?

To such inconveniences shall we be led if we change the settled system, adopted at the Treasury immediately after the organization of the government, and followed, without deviation, for fifty years. It is true that an argument ab inconvenienti is

[The United States v. Dickson.]

not to be pressed against the clearly ascertained rights of individuals, nor is a construction made by the executive officers, to be presented as a controlling authority or precedent to a judicial tribunal. But in this case it is to be remembered that the end to be attained is not the interest of an individual, but the best mode of effecting a great public object; that besides, in point of fact, the interest of the individuals is not, as a general rule, affected injuriously by one system more than the other; and that the whole subject is one to which the test of public convenience or the reverse may be applied with peculiar propriety. The construction adopted by the Treasury Department may not have in itself any controlling weight, but it is to be recollected that its adoption, at an early period, fixed a rule for the settlement of accounts and compensation well known to the country and the legislature; numerous laws upon these subjects have since been passed; and it is not, therefore, an unjust inference that Congress has intended its legislation to be applicable to that construction.

2. If the series of acts of Congress is examined, it will not be less apparent that, from the beginning of the government, they have contemplated annual salaries as the compensation of these officers, and quarterly settlements of their accounts; and this, not for arbitrary and uncertain periods, but for distinct and ascertained fiscal terms. This is the case as well with officers of the customs as with those connected with the public lands. The regular days of quarterly settlement, as adopted at the Treasury, are also recognised by these acts. 1 Story's Laws, 17. 26. 129. 150. 157. 228. 592. 665. 782. 786. 2 Story's Laws, 868. 932, 933. 950. 1309. 3 Story's Laws, 1632. 1710. 1790. 1792. 1853. 1857. 1876. 1916. It seems impossible to construe these various provisions as fixing a different rule or period for accounting and for making compensation. The compensation is "for the year;" for the duties performed "during the year;" for the duties embraced in the accounts as rendered and settled "for the year." Fixed annual compensation is that which is almost universally established for all offices. The exceptions are comparatively few; and those few Congress are constantly removing, as they grow up from some incidental circumstance. The fund from which this compensation is paid does not affect its character or amount. Whether it is paid by a commission out of the accru-

ing revenue, before it goes into the treasury, or whether it is drawn from the Treasury afterwards, is immaterial, if the sum fixed be so much "for the year." If the sum and the term are both fixed, the compensation is in reality a salary, and the payment of it is to be allowed and accounted for, exactly as if it were a salary, payable by annual appropriation out of the Treasury. The mere fact that the compensation is for the collection of money, cannot warrant an increase in proportion to the amount collected. From the Treasurer of the United States down to the Collector of the smallest port, there are numerous officers charged with the management of the public moneys, yet such a general rule has never been adopted.

It would seem, then, that whether we take the system established by public convenience, and by the construction early given to the regulations made for the settlement of accounts and the payment of compensation depending on those accounts; or whether we follow the general scope of the long series of legislative enactments, we are equally authorized to adhere to the existing practice, in preference to that which the decision of the District Judge of Mississippi will introduce in lieu of it.

Mr. Justice STORY delivered the opinion of the Court.

This is a case of a writ of error to the Circuit Court, for the Southern District of Mississippi.

The defendant in error, Samuel W. Dickson, was duly appointed a Receiver of Public Moneys, for the Choctaw district, in Mississippi, and entered upon the duties of his office, on the 22d of November, 1833. He continued to hold the office until the 26th of July, 1836, when he resigned it. In May, 1839, a suit was instituted upon his official bond, against him and his sureties, to recover certain sums of public moneys received by him, and not paid over. At the trial of the cause, Dickson insisted upon certain credits to be allowed to him, and proved the receipt by him, while Receiver, into his office, as Receiver of public money, amounting to more than two hundred and fifty thousand dollars, in each year, during the two years of his continuance in office: and also of more than two hundred and fifty thousand dollars for the fraction of a year, commencing on the 22d of November, 1835, and ending on the 26th of July, 1836, when he resigned

his office ; and he also proved the depositing of sufficient amounts in Natchez, to entitle him to credit for the disputed items of his account.    Upon this evidence, the Court below charged the jury that Dickson was entitled to credit for three thousand dollars, as compensation, including his salary of five hundred dollars, for the year commencing on the 22d of November, 1833, and ending on the 22d of November, 1834 ; and to the like compensation for the year commencing on the 22d of November, 1834 ; and ending on the 22d of November, 1835 : and that for the fraction of a year between the 22d of November, 1835, and the 26th of July, 1836, he was entitled to two thousand five hundred dollars for commissions.    To this opinion, and charge of the Court, a bill of exceptions was taken by the United States ; and a verdict having been found accordingly by the jury, and judgment rendered thereon ; the present writ of error has been brought to revise that judgment.

Upon the argument in this Court, two points have been made, on behalf of the United States : First, That the charge of the Court below was erroneous, in allowing the Receiver to calculate his yearly commission on the amount of public moneys received by him, during a year, commencing from the date of his appointment ; instead of calculating it by the fiscal year, which commences with the calendar year, or on the first day of January of every year.    Secondly, That the charge of the Court below was erroneous, in allowing the Receiver to charge the whole yearly maximum of commissions for the fractional portion of the year in which he resigned.

· The validity of these objections to the charge of the Circuit Court, must essentially depend upon the true interpretation of the act of the 20th of April, 1818, ch. 118.    Originally, the Receivers of Public Moneys in the land offices, were paid a commission of one per cent. on the moneys received by them, as a compensation for clerk hire, receiving, and keeping, and transmitting the public moneys to the Treasury of the United States. This was originally provided by the act of the 10th of May, 1800, ch. 55. § 6.    By the act of the 26th of March, 1804, ch. 35. § 14, the compensation was increased by an addition of one-half per cent. to the former commission, and also of an annual salary of five hundred dollars, with the exception of the land

[The United States v. Dickson.]

office of Marietta, where the annual salary was two hundred dollars, only. Then came the act of the 20th of April, 1818, ch. 118, which provided "that instead of the compensation now allowed by law to the Receivers of the Public Moneys, for the lands of the United States, they shall receive an annual salary of five hundred dollars each, and a commission of one per cent. on the moneys received, as a compensation for clerk hire, receiving, safe keeping, and transmitting such moneys to the Treasury of the United States: provided always, that the whole amount which any Receiver of Public Moneys shall receive, under the provisions of this act, shall not exceed for any one year, the sum of three thousand dollars."

The main controversy in the present case, turns upon the meaning of the phrase, "any one year," in the foregoing section. Does it mean "any one year" calculated from the date of the commission of the Receiver? or does it mean "any one year" commencing with the calendar year, that is, with the 1st of January of each year; which is commonly called, in matters connected with the Treasury Department, the fiscal year?

The argument addressed to us on behalf of the government, is, that it means the latter. It is said that all accounting officers (with some unimportant exceptions) are required by law, and the regulations of the Treasury Department, to render quarterly accounts of the moneys received by them, and of the disbursements made by them, at the end of each quarter of the calendar year; (see act of 10th of May, 1800, ch. 55;) and that all the accounts kept at the Treasury Department are governed by this mode of proceeding: and that if any other mode of keeping the accounts were adopted, it would introduce endless embarrassment and confusion into the Department, and take away the only adequate means of ascertaining from time to time the exact financial state thereof, as to debts, and credits, and disbursements, which is so essential to the public security, and regular operations of the government. And hence, in order to give full effect to this system, it is contended that it is necessary, in all laws of this character, to construe the year to mean the fiscal year.

Admitting the argument in its full force, (and we are not disposed to controvert the propriety of the present mode of keeping the public accounts, as being founded as well in law, as in public

convenience,) still it does not appear to us to justify the conclusion attempted to be drawn from it. In short, we do not perceive what connexion the mode of keeping the accounts in the Treasury Department, has with the compensation allowed by law to any public officer. That compensation is to be ascertained from the terms of the law allowing it; and whenever the amount is once ascertained, according to those terms, it is to be allowed and credited to the officer, whatever may be the form in which the public accounts are kept, or the particular times at which they are required to be rendered and settled. Nor are we able to understand why the accounts of any public officer may not be made up regularly at the end of every fiscal quarter, allowing such compensation as he has then earned and is entitled to by law, where his precedent term of service has been less than a full quarter, in consequence of an intermediate appointment to office. The allowance for the fraction of a quarter may just as readily be made at the commencement of his term of service, by reason of such an intermediate appointment, as it may be where his office terminates in the midst of a quarter; in which case, (as is admitted,) from necessity, the fraction is brought into his closing official account.

It has been also argued, that the uniform construction given to the act of 1818, ever since its passage, by the Treasury Department, has been that the act has reference to the fiscal year. The construction so given by the Treasury Department to any law affecting its arrangements and concerns, is certainly entitled to great respect. Still, however, if it is not in conformity to the true intendment and provisions of the law, it cannot be permitted to conclude the judgment of a Court of justice. The construction given to the laws by any department of the executive government, is necessarily ex parte, without the benefit of an opposing argument, in a suit where the very matter is in controversy; and when the construction is once given, there is no opportunity to question or revise it by those who are most interested in it as officers, deriving their salary and emoluments therefrom, for they cannot bring the case to the test of a judicial decision. It is only when they are sued by the government for some supposed default or balance, that they can assert their rights. Their acquiescence, therefore, is almost from a moral necessity, when

o 2                    21

there is no choice but obedience, as a matter of policy or duty. But, it is not to be forgotten, that ours is a government of laws, and not of men; and that the Judicial Department has imposed upon it, by the Constitution, the solemn duty to interpret the laws, in the last resort; and however disagreeable that duty may be, in cases where its own judgment shall differ from that of other high functionaries, it is not at liberty to surrender, or to waive it.

The present question, then, must be decided upon the same principles by which we ascertain the interpretation of all other laws; by the intention of the legislature as it is to be deduced from the language and the apparent object of the enactment.

The object of the act of 1818, manifestly is to provide a suitable compensation for the Receivers and Registers of Public Moneys for the public lands. The compensation is for services to be rendered by them, officially, during their continuance in office; and up to a certain point, at least, it is in exact proportion to the extent and duration of those services, and the responsibility incurred thereby. The compensation is measured by years. It is to be by an annual salary, and by a commission not exceeding an annual amount. The words are, that " they shall receive an annual salary of five hundred dollars each." The natural interpretation of these words, certainly is, that the salary is to commence at the time when the service is to commence; and that they are to be contemporaneous with each other. We believe this to be the uniform interpretation of all laws of this sort; and that when any person takes office in an intermediate time between one quarter and another, the practice is to pay him a proportion of the quarter's salary, accordingly; and if he leaves office before the end of his official year, to pay him for the like proportion of the last quarter. Indeed it was admitted at the argument, that this is the rule adopted at the Treasury Department itself, in relation to the salaries of officers, viz.: that it is begun and ended with the official year; and not with the fiscal year. Nor was it suggested that, in this particular, any difficulty arose, as to the mode of keeping and settling the official accounts at the Treasury, at the end of each quarter, or of the fiscal year.

If, then, the natural interpretation of the words of the act, as

to the salary, has reference to the official year, and not to the fiscal year; what ground is there to presume that Congress, in the subsequent words regulating the commission, did not use the word year in the like sense? There is nothing in the language or in the nature of the compensation, which leads us to the conclusion that Congress had in view the fiscal year, or the mode of keeping the accounts in the Treasury Department, as guides to fix the interpretation of the word year. For aught that appears, it was used in its ordinary sense. The words are, "and a commission of one per cent. on the moneys received, as a compensation for clerk-hire, receiving, safe keeping, and transmitting such moneys of the United States; provided always, that the whole amount which any Receiver of Public Moneys shall receive under the provisions of this act, shall not exceed, for any one year, the sum of three thousand dollars." The commission is on the moneys received by any one officer, not by one or more officers, during any one year of his services; not during any one calendar year, for the services of one or more officers in that year. It is his compensation for clerk-hire, paid by him, and for his responsibilities in receiving, keeping, and transmitting the public moneys; and not for his services and responsibility in connexion with other officers. The commission is a compensation attached to the particular officer for his yearly service, and not to the office itself for a fiscal year. If the intention of the legislature had been what the argument for the United States supposes, the language of the proviso would have been different; it would have been, provided that the United States shall not, in any one calendar year, pay more than one per centum upon all the moneys received during that year; and that the commission for any one year to whomsoever paid, shall not, in the whole, exceed the sum of twenty-five hundred dollars. It need not be said, how entirely different in its scope and legal intendment such language is from that of the present proviso; and yet the argument is, that the Court should give them precisely the same interpretation. We cannot but think that this is to call upon the Court, not to expound the act as it is, but to frame its provisions anew, upon a conjecture of what might have been the original intention and object of Congress.

It is further urged, that unless we interpret the words to refer

to the fiscal year, great inconveniences may arise; and the government may, by there being several Receivers in office during one and the same fiscal year, each of whom may have received more public moneys than would entitle him to the maximum of commissions, be compellable to pay more than twenty-five hundred dollars in one year; nay, may actually pay twice or thrice that amount. Suppose it might be so, it would be a case of very rare occurrence; and to put an extreme case is not a good test of the fair and just interpretation of any statute. In such a case each successive Receiver would only receive his just proportion of the year's salary, and no more commission than Congress itself had established to be a reasonable compensation for his expenditures and responsibilities in receiving, safe keeping, and transmitting the public moneys. There is nothing in the reason of the case, why each successive officer, who has incurred the full responsibility, by the receipt of two hundred and fifty thousand dollars, should not receive the whole commission up to that extent. The argument ab inconvenienti, therefore, under such circumstances, does not address itself to this Court with the force which it has been supposed to possess. It amounts merely to this, that the act is defective in some of its details; and does not reach all the cases which ought to be provided for.

But there would be inconveniences, not to say apparent hardships, upon the Receivers, in adopting the construction contended for on behalf of the government. Thus, suppose a Receiver should die, or be removed from office without any default on his own part, during the fiscal year, and after he had received and become responsible for public moneys exceeding two hundred and fifty thousand dollars; in such a case, the extent of the act would seem fairly to entitle him to the full commission of two thousand five hundred dollars; and yet, according to the argument, he would be compelled to submit to an apportionment, which might reduce it to a quarter part thereof.

There is another consideration not unimportant in the construction of the act; it is, that the limitation of the compensation which any Receiver is to receive for any one year, is not, including his salary, to exceed the sum of three thousand dollars. So that here we have both salary and commissions united together in the ascertainment of the amount; and, of course, the year,

with reference to each, must have the same period of commencement and termination. If, therefore, the salary is to be ascertained by the official year, as has been already suggested, it would seem to be an irresistible conclusion, that the same period must be assigned for the commissions.

Passing from these considerations to another, which necessarily brings under review the second point of objection to the charge of the Court below; we are led to the general rule of law which has always prevailed, and become consecrated almost as a maxim in the interpretation of statutes, that where the enacting clause is general in its language and objects, and a proviso is afterwards introduced, that proviso is construed strictly, and takes no case out of the enacting clause which does not fall fairly within its terms. In short, a proviso carves special exceptions only out of the enacting clause; and those who set up any such exception, must establish it as being within the words as well as within the reason thereof. Applying this rule to the circumstances of the present case, how does it stand? The enacting clause gives to each Receiver a commission of one per cent. upon all the public moneys received by him. This was precisely in conformity to the antecedent laws. The proviso limits that per centage to an amount not exceeding two thousand five hundred dollars; for any one year. Until, then, the per centage of the particular Receiver has reached that amount, in whatever period of the year it may arrive, the proviso, according to its very terms, has no operation: and when that maximum is reached, the per centage ceases, whether any more public moneys are received by that officer or not. The case, then, of the present Receiver falls directly within the enacting clause. He seeks only the maximum commissions upon the moneys actually received by him during his continuance in office; and the proviso either does not touch his case, or it only operates to cut off all subsequent commissions from him, for other moneys received during his continuance in office. The proviso contains no limitations of his per centage, by connecting it with, or making it dependent upon the commissions, or the receipt of public moneys by his successor in office. The proviso is, that he shall receive no more for any one year; not that any other Receiver may not receive a like compensation accruing from his subsequent appointment and

receipts in office, for the portion of any year which is then unexpired.

Upon the whole, we are of opinion, that there is no error in the charge and opinion of the Court below; and, therefore, the judgment is affirmed.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Southern District of Mississippi, and was argued by counsel. On consideration whereof, it is ordered and adjudged by this Court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, affirmed.