**CANADIAN PAC. RY. CO. v. UNITED STATES.**

**No. 7366.**

Circuit Court of Appeals, Ninth Circuit.

Nov. 13, 1934.

Bogle, Bogle & Gates, Norman M. Littell, and Edward G. Dobrin, all of Seattle, Wash., for appellant.

J. Charles Dennis, U. S. Atty., and John Ambler, Asst. U. S. Atty., both of Seattle, Wash.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

GARRECHT, Circuit Judge.

This action was brought by the United States against the Canadian Pacific Railway Company to recover $4,331.13 for "overtime" services rendered by inspectors and employees of the United States Immigration Service in connection with the examining and landing of passengers and crews from the company's vessels. Judgment was for the government for the full amount claimed less $86.33, paid before trial, as to which there was no dispute.

The statute (8 USCA §§ 109a and 109b) covering overtime compensation for employees and inspectors to be paid by the captain, master, owner's agent, etc., contains a proviso which excepts from payment of the overtime compensation, among others, international ferries when operating on regular schedules at designated ports of entry for passengers to the United States.

Appellant claims its boats are "international ferries" operating on regular schedule and, as such, exempted from payment of the overtime compensation.

From the findings of the District Court it appears that the appellant operates between Vancouver, B. C., Victoria, B. C., and Seattle, over waters classified by the United States Department of Commerce and by the Pilot Rules for Inland Waters as a portion of the high seas, the following vessels, termed by its advertising circulars "The Princess Liners":

| | Gross Tonnage | Passenger Capacity | No. of Beds | No. of Strms. | Dining Rm. Capacity |
|---|---|---|---|---|---|
| Princess Kathleen | 5875 | 1500 | 290 | 136 | 165 |
| Princess Marguerite | 5875 | 1500 | 290 | 136 | 166 |
| Princess Louise | 4200 | 1200 | 261 | 132 | 129 |
| Princess Charlotte | 3924 | 1200 | 230 | 118 | 118 |
| Princess Adelaide | 3060 | 1200 | 206 | 103 | 84 |

Of those enumerated, the Princess Kathleen and the Princess Marguerite are apparently regularly assigned to the run, with the other boats filling in the schedule when needed. The above boats are the only vessels of appellant against which the overtime charges were levied. These vessels are not the conventional open-end ferry boats, but are designed with a bow and stern and have side ports for the accommodation of automobiles and freight. The run from Seattle to Vancouver is set out to be 145 miles; that from Vancouver to Victoria as 83 miles; and that from Victoria to Seattle as 81 miles. The night steamers travel direct, between Vancouver and Seattle, while the day steamers go via Victoria. It was testified by the government's witness that the Princess Marguerite, Princess Kathleen, and Princess Charlotte were daily entered and cleared by the Deputy Collector of Customs, as they came in and went out of the Port of Seattle. He also testified that the vessels were classified by the Steamboat Inspection Service as foreign passenger vessels.

The proviso (8 USCA § 109b) under which appellant claims exemption from payment for overtime immigration inspection charges reads as follows: " * * * Provided, That this section shall not apply to the inspection at designated ports of entry of passengers arriving by international ferries, bridges, or tunnels, or by aircraft, railroad trains, or vessels on the Great Lakes and connecting waterways, when operating on regular schedules. (Mar. 2, 1931, c. 368, § 2, 46 Stat. 1467.)"

Appellant admits that its activities are not covered by any ordinary definition of a "ferry," but insists that its operations come within the exemption intended by Congress to be extended to "international ferries." It argues that the decisions usually applied to ferries should not be invoked, since admittedly it does not come within such designation. But it is urged that Congress by the inclusion of the words "international ferries" intended to cover the activities of its vessels and to except it from the overtime charge. So far as we have been able to ascertain, there has been no judicial construction of the term "international ferry," and, in arriving at the legislative intent in the use of these words, assistance by way of analogy may be derived from definitions and decisions as to what ordinarily constitutes a "ferry." We must also have in mind the purpose of the enactment, the character of the service rendered, the length of the run, the place or locality served, and the manner in which the trips of the vessels in question are made.

Bouvier's Law Dictionary (1928) p. 408 defines "ferry" as follows:

" * * * Ferry properly means a place of transit across a river or arm of the sea;

but in law it is treated as a franchise, and defined as the exclusive right to carry passengers across a river, or arm of the sea, from one vill to another, or to connect a continuous line of road leading from township or vill to another. * * *

"In England, ferries are established by royal grant or by prescription, which is an implied grant; in the United States, by legislative authority, exercised either directly or by a delegation of powers to courts, commissioners, or municipalities. * * *."

At common law a franchise was necessary to the creation of a ferry and, as appears from Bouvier, an integral part of the definition. "In England the power of granting ferry franchises emanates from the crown. In Canada the right is vested in the provinces, except as to ferries between a province and any British or foreign country or between two provinces, which are subjects of Dominion legislation. In the United States ferries are established by the legislative authority of the states, which is exercised either directly by a special act of the legislature, or through some inferior body to which power has been delegated under the provisions of a general law. * * * The power of establishing ferries is never exercised by the federal government, but lies within the scope of those undelegated powers which are reserved to the states respectively." 25 C. J. § 5, p. 1052. See Conway et al. v. Taylor's Executor, 1 Black (66 U. S.) 603, 17 L. Ed. 191.

"The states, and not the federal government, have the authority to establish ferries upon waters forming a boundary between the states, or between a state and a foreign country. The franchise of one state can confer no rights as to landing upon or ferrying from the other state, but is valid as far as the jurisdiction of the state which grants the franchise extends, without any concurrent action on the part of the other state. The franchise of either state may be made exclusive as to ferrying from its own shore, but it cannot be made to exclude ferries operating under franchises granted by the state on the opposite shore. The jurisdiction of a state over a ferry is determined by its point of departure, and the fact that the landing place is in another jurisdiction does not take it out of the jurisdiction of the authority which granted the franchise. * * *." 25 C. J. § 9, p. 1055.

Appellant concedes the common-law definition of "ferry" as a franchise right, but cites City of Sault Ste. Marie v. International Transit Co., 234 U. S. 333, 34 S. Ct. 826, 828, 58 L. Ed. 1337, 52 L. R. A. (N. S.) 574,

as authority to the effect that a state has no power to issue a franchise for international ferries, and that therefore a franchise which was an essential element in the establishment of a ferry at common law is not required in the operation of an international ferry. The case cited is not authority for the proposition advanced. The transit company held a license from the Dominion government to operate a ferry between Sault Ste. Marie, Ontario, and Sault Ste. Marie, Mich. The point in controversy was whether the city of Michigan could require the company to take out in addition to its franchise a local license for the privilege of carrying on interstate or foreign commerce. The court said:

"The fundamental principle involved has been applied by this court in recent decisions in a great variety of circumstances, and it must be taken to be firmly established that one otherwise enjoying full capacity for the purpose cannot be compelled to take out a local license for the mere privilege of carrying on interstate or foreign commerce. [Cases cited.]

"Assuming that, by reason of the local considerations pertinent to the operation of ferries, there exists, in the absence of Federal action, a local protective power to prevent extortion in the rates charged for ferriage from the shore of the state, and to prescribe reasonable regulations necessary to secure good order and convenience, we think that the action of the city in the present case in requiring the appellee to take out a license, and to pay a license fee, for the privilege of transacting the business conducted at its wharf, was beyond the power which the state could exercise either directly or by delegation. * * *."

The case of Mayor, etc., of Town of Vidalia v. McNeely, 274 U. S. 676, 682, 47 S. Ct. 758, 761, 71 L. Ed. 1292, sets out the portion of the Sault Ste. Marie Case quoted above and says, relative to an ordinance of the town of Vidalia which had the effect of prohibiting McNeely from operating an interstate ferry (which he previously had operated for over 20 years): " * * * The question is not whether the town may fix reasonable rates applicable to ferriage *from* its river front or may prescribe reasonable regulations calculated to secure safety and convenience in the conduct of the business, but whether it may make its consent and license a condition precedent to a right to engage therein. This we hold it may not do." (Italics ours.) This case, at page 681 of 274 U. S., 47 S. Ct. 758, 760, precedes a discussion of Port Richmond Ferry Co. v. Hudson County, 234 U. S. 317,

34 S. Ct. 821, 58 L. Ed. 1330, another case cited by appellant, with the following words: "But, while holding that such interstate transportation is subject to congressional regulation, this court always has recognized that ferries operated across boundary waters between states simply as a means of transit from shore to shore should be deemed instruments of local convenience, and subject to local regulation, to the extent that, in the absence of congressional action, each state may act with respect to the ferriage *from* its shore. * * *" (Italics ours.)

These cases do not sustain the contention that a franchise was not an essential element of a ferry. The holding was that the state or the city could not require a local license or additional franchise from a vessel before it would be permitted to carry on interstate or foreign commerce. There is no showing here made that any of these vessels operated by appellant have a franchise from the Dominion government to operate a ferry, which seems to have been the fact in the cases cited. Also, the appellant is a Canadian corporation operating its boats from Victoria and Vancouver to Seattle and return, and the jurisdiction of a government over a ferry is determined by the point of departure.

The question here involved is not one of restriction of commerce or tax on the privilege of carrying on foreign trade, but a claim for reimbursement for services rendered and paid for by the government for the accommodation of the appellant.

The committee reports and discussion in Congress indicate that the purpose of the statute was to have ocean-going vessels pay extra compensation for the services of the United States Immigration Inspectors after 5 p. m., the same as is paid in the Customs Service, and there was no intent by the proviso to change the purpose of the bill in its application to general steamship lines.

A proviso or exception which restricts the general scope of the act must be strictly construed, and will not be permitted to take any case out of the enacting clause which does not clearly fall within its terms, and the burden of proof is on one claiming the benefit of the proviso. United States v. Dickson, 15 Pet. 141, 10 L. Ed. 689; Thomas E. Basham Co. v. Lucas (D. C. Ky.) 21 F.(2d) 550. The proviso excepts "vessels on the Great Lakes and connecting waterways." If the Congress had intended that vessels plying on Puget Sound, engaged in services such as provided by appellant, were to be exempted, it is fair to

assume that provision would have been made directly in the act, and not left them to be classified under the uncertain term "international ferries." Besides, the provisions of exemption in the Customs Overtime Act are almost identical with the act here under discussion. Appellant has been required to pay, and pays without question, the fees required under the Customs Service Act.

The report of the Senate Committee on Immigration (No. 1720), which forms a part of "Defendant's Exhibit No. 11," contains the following:

"The bill as amended in the House limited the application of overtime to ocean ports of entry. Your committee is of the opinion that certain conditions at the international borders are equally meritorious, and has therefore provided that overtime shall apply to the international boundary as well as to ocean ports, except under the following conditions:

" 'Overtime shall not apply to international ferries, bridges or tunnels.

" 'Nor shall aircraft, railroad trains, or vessels on the Great Lakes and connecting waterways be subject to assessments for overtime duties performed by immigration employees when they are operating on their regular schedules.

" 'One of the best reasons for favoring this legislation is that for many years the customs employees have had a similar overtime provision to that proposed in this bill, while the immigration officers working side by side with them in the performance of their duties have been, so far, discriminated against. * * *

" 'It is the opinion of the committee that the bill is justified by the principle that the transportation companies should reimburse the Government for special services at unusual hours that advance their own interests. * * *' "

Counsel for appellant would have us believe that an "international ferry" is something different from a "ferry." As we view it, the difference is of degree and not of kind. There is no magic in the word "international" to change a thing into something else. A ferry is the same whether it connect villages, states, or nations:

While, as contended by appellants, mere distance is not decisive, it is an element to be considered and must be taken into account. The Court of Appeals of New York, in Mayor, etc., v. New Jersey Steam-Boat Nav. Co., etc., 106 N. Y. 28, 12 N. E. 435, 436, says: " * * * It is impossible in a general way to specify to what distance over intervening

waters ferries may be operated. A ferry could not be established between New York and Boston, or New York and Newport or Philadelphia. The distance would be too great, and the business of transporting passengers and freight between such distant places would be that of common carriers upon public waters. But when the intervening waters are not wide, and can be traversed at regular and brief intervals by boats adapted to a ferry business, there can be no question that ferries may be established and operated."

Another case, North River Steamboat Co. v. Livingston (N. Y.) 3 Cow. 713, 754, has this to say: "* * * To speak of a ferry from New York to Albany, is as great an abuse of terms, as to talk of a ferry from New Orleans to St. Louis or Pittsburgh, or even from New York to Liverpool. * * *"

We think the distance traveled too great, the elapsed time too long, to permit appellant's boats to fall within the definition of a "ferry."

A trip in these vessels from Vancouver to Victoria and Seattle is extensively advertised and designated as a "Triangle Tour." These boats in fact are, as classified by the United States Steamboat Inspection Service, "Foreign Passenger Vessels."

We quote the fine phrasing of Judge Neterer appearing in the findings of fact (4 F. Supp. 851, 853):

"The vessels are of the ocean liner type, with a deck arrangement for automobiles with other cargo, all embarking and debarking at the side port or gangway. The spacious dining room service and berths and sleeping apartments indicate comfort and service, other than ferry service. A ferry is a service of necessity, for the common good, to reach a point across a stream, lagoon or lake, or bay. The service of the vessels in issue predominates in no such service, but rather offers a privilege to view the scenic beauties afforded by the many islands of the San Juan Archipelago of Puget Sound, pronounced by tourists to equal the beauties of the Thousand Islands of the Gulf of St. Lawrence, and it is said the picturesque sunset is not surpassed by the sunset of the Bay of Naples, and give, instead of a ferry service, a delightful scenic service and service competitive—not necessary—with the almost parallel line of the railway and the Pacific Highway, a public thoroughfare between Seattle and Vancouver, B. C., for a distance of approximately 145 miles. Nor does the service furnish a connecting link for highway traffic. * * *

"It is obvious from the conventional seagoing construction of the vessels, the character of the service rendered, and absence of compliance or attempt to comply with local ferry laws, the defendant was not and is not operating the vessels in issue as an international ferry, and therefore within the exception, section 109b, title 8 USCA. * * *"

Affirmed.