UNITED STATES *v.* SAYLOR and others.

*(Circuit Court, E. D. Michigan.* January 27, 1887.)

1. POSTMASTER—LIABILITY TO GOVERNMENT—RENT OF OFFICE.
    Where a postmaster rented a post-office for the government at $1,000 per year, and received a secret rebate of $150 from his landlord, and also sublet portions of the space so rented for a news-stand and a confectionery stand, and received rent therefor, *held,* that he and the sureties upon his bond were liable to the government for such rebate and rent.

2. SAME—DEFENSE—OFFSET.
    It is no defense to such claim for the rebate that the defendant had incurred expense in procuring and fitting up boxes, making repairs, etc., for which no allowance was made by the department.

3. SAME—ACTS OF SPECIAL AGENTS.
    It is no defense to the claim for rent that the special agents of the department had frequently visited the office, seen the sub-tenants in possession, and made no claim for rent, it appearing that the department had no knowledge of these facts.

*(Syllabus by the Court.)*

This was an action against principal and sureties upon a bond given by defendant Saylor, as postmaster at East Saginaw, in this state. Two breaches were averred in the declaration: *First,* that defendant had returned vouchers for rent to a much greater amount than the rent actually paid; *second,* that he sublet to different persons portions of the post-office building, and received rent therefor, which he failed to report to the department. Plea, that if the said defendant did sublet as charged, and received rent therefor, the plaintiff, by its proper officers, had full knowledge, during all such period, of the facts of such subletting, and the receipt by said defendant of moneys therefor; that defendant openly treated said moneys so received as belonging to himself individually, for which he was not accountable to plaintiff in his capacity as postmaster,

or otherwise; and the said plaintiff did not, although well cognizant of
the facts, make any claim to the money so received, by way of reduc-
tion of the ·office rental allowed by plaintiff to the said defendant or
otherwise, but did, during the whole of said period, settle and adjust
with defendant quarterly the accounts and receipts of his office, and did
treat and hold such sums so received by defendant from said subletting
as no part of the official receipts in which plaintiff had any interest
or concern, and plaintiff is now estopped from making claim thereto.
That, upon the expiration of defendant's term of office, plaintiff, by its
proper officers, still having full knowledge of the facts, went over in de-
tail and adjusted the entire account of defendant for the full period of
his official term.

The case was tried before a jury by the district judge.    The facts, as
they appeared upon the trial, were substantially as follows:

Defendant entered upon the duties of his office, under this bond, February
3, 1880, and rented of one Lloyd the entire first floor of a building upon Wash-
ington street; that, in order to keep the post-office on this street, Lloyd and
other property owners agreed to pay him (Saylor) so much money yearly as
an inducement to retain the office there, Lloyd's subscription being $150, in-
dependent of the rent; that when he paid the rent he took receipts for $1,000
per year, but actually paid in money but $850.    Defendant offered to show
that, at the time he first rented this building of Lloyd, there were no post-of-
fice boxes or fixtures belonging to the government in connection with the of-
fice, and defendant supplied himself with them at his own expense; that the
cost of such fixtures was $1,200, besides the expense of removing them from
the former office, refitting, and setting them up; that there were also contin-
ual expenses for repairs, enlargement of fixtures, and maintaining the requi-
site paraphernalia of the office.    This testimony was ruled out by the court.
In July, 1882, he removed the post-office from the Lloyd building to the Seligman
building, and entered into substantially the same arrangement with Seligman
that he had with Lloyd, except that Seligman agreed to do better by him, and
gave him a rebate of $300 per year, taking receipts for a thousand dollars and
paying but seven hundred.    It also appeared that the defendant sublet a por-
tion of the space rented for the post-office to one Gibbs, at a rent of $600 per
year, to be used as a news-stand, and another portion to Jones & Ostrander
at eight to ten dollars per month, to be used as a confectionery stand, and
that he received the stipulated rent from these parties, which he did not ac-
count for.    There was also evidence tending to show that the inspectors and
special agents of the post-office department had full knowledge, from their
own observation, of the existence of the news-stand; that they were fre-
quently there, and made examination of the post-office premises, and the busi-
ness; that no inquiry was ever made by such agents, or by the department rel-
ative to the fact of the subletting, or the amount, if any, received by defend-
ant Saylor from that source; nor was any complaint made against the existence
or continuance of such news-stand; nor was any claim ever made by the gov-
ernment or its officers for the receipts from such subletting,.nor notice that the
same were postal revenue, and the said defendant never so regarded or treated
the same.    Defendant Saylor in his testimony stated that, in his conversation
with the special agent, the latter asked him what rent he paid, but did not ask
him any questions about the matter of subletting.    It further appeared that
on January 7, 1882, the postmaster general addressed defendant a letter, stat-
ing that complaints had reached the department that a confectionery stand
was kept in the post-office; that the department considered it improper in or

around a post-office in a large city, and desired the business removed, which was done. There was also a news-stand kept in the Seligman building, of which the special agents had the same notice.

There were quarterly settlements made with the government, and also annual settlements at the end of the fiscal year. A final account of all transactions with the defendant was settled June 30, 1884, after he left the office. The defendant also offered to prove that the practice of establishing newsstands and other business in offices of the first and second class was prevalent throughout Michigan and other states; that at Cadillac there was a bank in the building; that at Ann Arbor, Bay City, and West Bay City there were news-stands; that in the case of West Bay City the postmaster himself had charge of the news-stand, and occupied it, and sold papers in his own behalf; that all the special agents of the department were familiar with these facts; and that, in the instructions prepared and given by the department to its special agents and examiners, no inquiry is made as to subletting; also, commencing with 1860, a news-stand had been maintained in the office at East Saginaw to the knowledge of the government, from that day to the time the government first leased a building in its own behalf in 1885; and no claim for receipts from such subletting had been asserted by the department at any time. Defendant also offered to show, by the several defendant's sureties in their behalf, that these quarterly settlements were shown by him to his said sureties, and they were assured by him and assumed that everything pertaining to his accounts was all right; that they knew nothing about any claim made for receipts growing out of the subletting to the news-stand, and that they were advised by him that the settlements were made annually, and that the final settlement was made satisfactorily to the government. One Turner, a witness produced on his behalf, swore that he had been one of the inspectors of the post-office department during a portion of defendant's term, and had made one inspection of the Saginaw office on the blank form prepared by the department. On cross-examination, he swore that he never learned that defendant was renting a portion of the building out, and putting the money in his own pocket, and that there was nothing in the inspection made which brought any such facts to his knowledge; and that he made no inquiry with respect to this, and had no instructions so to do.

Upon this state of facts the jury were instructed to render a verdict for the plaintiff for the excess of rent allowed over that actually paid, and also for the amount of rent received from the subtenants. Motion was made for a new trial, and the case was argued before the circuit and district judges.

*John A. Edget* and *S. M. Cutcheon,* for the motion.

*C. P. Black,* Dist. Atty., for the United States.

JACKSON, C. J. After a careful examination of this case, I concur in the conclusion reached by his honor, the district judge, that the plaintiff is entitled to recover the amount for which judgment has been rendered, and that the motion for a new trial should be denied. It is perfectly clear that the postmaster cannot hold or legally claim the benefit of the rebates made by his several landlords. To the extent that said rebates reduced the rent below the sum allowed by the post-office department, the postmaster and his sureties are legally liable to refund to the government. Good faith and his agency relation to the government required the *bona fide* expenditure of the allowance made, for rent actually paid; and the postmaster could not lawfully appropriate it otherwise, or by

v.31F.no.9—35

any collusive arrangement with his landlord derive a personal benefit therefrom in excess of the rent actually paid. If this were otherwise doubtful under the evidence of the postmaster himself, *his quarterly vouchers for rent paid would conclude him on the question.*

On the other branch of the case, viz., the right of the government to hold the postmaster liable for the amounts received from subletting portions of the premises rented for post-office purposes, I had, at first, some doubt, but upon further reflection, and in view of the fact that the allowance made to the postmaster was for the *whole space* (the first floor of the building) rented and appropriated to the use of the government, as shown by the proof, I am forced to the conclusion that the postmaster could not devote any portion of such space to *private* use, or take a personal benefit to himself therefrom, without a breach of the duty which every agent owes to his principal whose business he is intrusted to manage, viz., that of good faith, and the obligation to conduct the business for the sole benefit of the principal.

One of the department regulations (No. 72) required the postmaster to report whether "the clerk hire or *other allowance* was *more* or *less* than the service required." Under this regulation and requirement, could the postmaster, without a breach of official duty, neglect to report that the $600 or $900 allowance for rent was *more* than the service required, while actually receiving from subtenants rents for *portions* of the *very space* or *premises* appropriated for post-office purposes, and for which the allowance was made? I think not. He could not be allowed to say that, although the allowance is made in consideration of the appropriation of the *whole premises* (the entire first floor) for government use as a post-office, and the convenience of the public in connection therewith, there is nevertheless a certain portion of the space, so appropriated and allowed for, which is not in fact needed to meet the wants of the government or the convenience of the public, and "I will therefore devote that portion of the premises to my private benefit, and thereby save a large part of the allowance made for rent." His agency relations required him to make *that saving*, out of space or premises rented for post-office purposes, for the benefit of his principal, the United States. It can hardly be doubted that, if he had reported the actual facts, his allowance for rent would have been reduced in exact proportion to his receipts from the post-office premises. The fact that the postmaster was himself the lessee of the premises from the owner of the property does not affect the question or change the principle on which we rest his liability. Take the allowance of $1,000 for clerk hire. Suppose the postmaster had employed a clerk at that salary, and had then entered into an agreement with a neighboring merchant that one-fourth of the clerk's time and services, embracing the hours covered by his employment, should be devoted to keeping the books of such merchant, and for which the postmaster was to be individually paid the sum of $250 per annum, would it be seriously insisted that the postmaster could retain the *whole* $1,000 for clerk hire under the allowance? Hardly, and yet it is difficult to see wherein consists the difference between making a profit on the clerk's

*time* and *services* allowed for by the government and the making of a similar profit out of the "*space*" appropriated to post-office purposes, for which a like allowance is made. The long-continued practice of post-masters, and the apparent acquiescence of the government officials in acts and transactions of this character, cannot be invoked to legalize them. They are contrary to public policy, and violation of that good faith which every one acting in the fiduciary capacity in the handling and expenditure of another's funds must observe.

I concur with the district judge in thinking there is no error in the judgment heretofore rendered against the defendants, and that the motion for a new trial should be overruled.

BROWN, D. J. I have seen no reason to change the opinion I expressed at the trial. Defendant Saylor was allowed a thousand dollars per year with which to rent the post-office at Saginaw. At the end of every quarter an account was stated between the department and the landlord for the rent of the quarter, $250, and a receipt was appended and sent to the department as a voucher for the expenditure. The defendant paid the landlord in fact but $212.50. Now, by whatever name this difference is called, it is in fact a less sum paid for rent than the vouchers represented. Gilding it with the name of *rebate* does not change at all the legal or moral character of the transaction. The government placed in his hands a thousand dollars as an appropriation for rent, and it was his duty to make the best possible terms for the government. He was at liberty to expend the entire amount, if it was necessary, to procure a proper office; but if he could procure one for a less sum it was his duty to do it, and return the difference. It is quite possible that a large land-owner, or an association of land-owners, might regard the location of the post-office as so desirable for their property that they would be willing to provide the department with a building free of expense. Upon defendant's theory, however, it would only be necessary for him to induce the landlord to give vouchers for a thousand dollars to justify him in putting the whole amount in his pocket.

It is no excuse that the defendant was obliged to expend money in procuring boxes and other fixtures, and in incurring of expenses for repairs for which no allowance was made by the department. If the department had intended to allow for these expenditures, such allowance would have been made *eo nomine;* if not, the defendant had no right to obtain a secret concession of the amount under another name. The amount of these expenditures, too, bore no relation whatever to the amount of the rebate. It may have been more, it may have been less; but, whatever it was, the rebate was not gauged by it at all, nor had one any connection with the other.

His retention of the rents received from his subtenants is equally indefensible. He rented for the government, and as the agent of the post-office department, certain space for the post-office. This space belonged absolutely to the government during the continuance of the lease. If it was larger than was necessary for the purpose of the post-office, and

defendant chose to lease the superfluous space to private individuals, he did so as the agent of the government, and the government is entitled to the rent. In other words, he has no right to receive rents as an individual for space for which he pays rent as an agent for the government. If the department had placed in his hands a thousand dollars for office expenses, and had taken vouchers from *him* to that amount, it might well be argued that it was no concern of the government what he did with the money, so long as proper facilities were provided. But the money was placed in his hands to rent a post-office. The vouchers show a lease between the government and the landlord, and a receipt of the rent from Saylor as the disbursing officer of the government. Indeed, it was perfectly competent for the government to employ another person to lease this building, and pay the rent, if it had chosen to do so.

If this case had arisen between private individuals,—if, for example, a merchant in Detroit, desiring to set up a branch establishment at East Saginaw, were to send an agent there to rent a building, giving him a thousand dollars for that purpose, and he rented a building at that sum, and, not needing the whole of it, sublet portions of it to other persons, —it would scarcely be contended that the money so received did not belong to the principal. The fact that the principal is the United States instead of an individual does not vary the legal rights of the parties. Between the rebate of three hundred dollars, the rent of six hundred dollars from Gibbs, and the rent of eight to ten dollars per month from Jones & Ostrander, the defendant in fact managed to obtain a post-office for nothing, and to apply the entire thousand dollars to his own use. With equal justice he might rent any other building of a dozen rooms for the use of the department, sublet all but one of these rooms for a much greater sum than he paid for the entire building, and make a handsome profit out of the transaction.

But it is urged that the plaintiff is estopped to make this claim by reason of the fact that the inspectors and agents of the department were in the habit of making frequent visits to East Saginaw, saw that portions of the post-office were occupied by others, and made no objections to it; that the accounts of the defendant were settled quarterly, and no claim whatever was ever made that these rents should be included; that the same thing had been done in Saginaw and in other places, in this and other states, for more than 20 years; that in the instructions prepared by the post-office department, and given to its agents and examiners, no inquiry is made as to subletting; and that all this constitutes a practical construction by the department that rents received in this way are not a part of the postal revenues, or "from any other source connected with the postal service," within the meaning of the bond, or to be accounted for to the department. While the contemporaneous and continuous construction of a statute or other writing by heads of departments and accounting officers is undoubtedly entitled to weight in a doubtful case, the doctrine is a somewhat dangerous one to import into actions for money unlawfully withheld by officers of the government, since defalcations of this kind are frequently rendered possible only by the connivance

or loose practices of government agents. If these officers were always prompt in the performance of their duties in the first instance, their omissions would not be allowed to become precedents. The remarks of Mr. Justice STORY in delivering the opinion of the supreme court in *U. S.* v. *Dickson*, 15 Pet. 161, are pertinent in this connection:

"The construction given to the laws by any department of the executive government is necessarily *ex parte*, without the benefit of an opposing argument, in a suit where the very matter is in controversy; and, when the construction is once given, there is no opportunity to question or revise it by those who are most interested in it as officers, deriving their salary and emoluments therefrom, for they cannot bring the case to the test of judicial decision. It is only when they are sued by the government for some supposed default or balance that they can assert their rights. Their acquiescence, therefore, is almost from a moral necessity, when there is no choice but obedience, as a matter of policy or duty. But it is not to be forgotten that ours is a government of laws, and not of men; and that the judicial department has imposed upon it by the constitution the solemn duty to interpret the laws in the last resort; and, however disagreeable that duty may be, in cases where its own judgment shall differ from that of other high functionaries it is not at liberty to surrender or to waive it."

But, when carefully analyzed, it will be seen that the testimony in this case falls far short of bearing out defendant's contention of a practical construction by the post-office department. It merely tends to show that certain subordinate officers, called "inspectors" or "special agents," whose duty appears to have been to make periodical examinations of the accounts and business of postmasters throughout their districts, probably saw that certain persons were carrying on the sale of newspapers and confectionery within the post-office building, and might have inquired of the postmaster his authority to permit this; and that this had been the practice of postmasters throughout this and other states, in different places, for a number of years. Conceding that all this was brought to their knowledge, they had no power to authorize or ratify this arrangement, and there is no evidence that they ever reported it to the postmaster-general, or to the accounting officers of the department. Their silence cannot be regarded as a construction of the statute, nor will their laches be imputable to the government. *U. S.* v. *Kirkpatrick*, 9 Wheat. 720. The only evidence of the knowledge of the department officers is contained in a letter of the postmaster general to the defendant, directing him to discontinue the practice. It is impossible to extort from this any recognition of its legality or consent to its continuance. While it is quite probable, under the practice which had prevailed so long, that the defendant may have honestly supposed that he was entitled to do what he pleased with the space not needed for his post-office, I do not think the government is estopped to claim the rent received by him.