### UNITED STATES v. COLORADO, W. & E. RY. CO.

(Circuit Court of Appeals, Eighth Circuit. October 22, 1923.)

No. 6404.

1. **Master and servant ⬤➡13—Duty of railroad to minimize excess service caused by unavoidable accident.**

Under Hours of Service Act, § 3 (Comp. St. § 8679), though a train is unavoidably delayed by unavoidable accident, and part of the excess service of members of its train crew is therefore excusable, it remains the railroad company's duty to do all reasonably within its power to minimize the excess service.

2. **Master and servant ⬤➡17—Negligence in not providing relief for train crew issue, though not pleaded.**

In an action for penalties under the Hours of Service Act (Comp. St. §§ 8677–8680), the negligence of defendant in not providing relief for the crew of a train delayed by unavoidable accident was in issue, though not charged or pleaded.

3. **Master and servant ⬤➡13—Railroad held not to have exercised diligence in minimizing excess service.**

Where a train crew, because of unavoidable accident, had been on duty more than 16 hours when it reached a station where crews at times took rest, and it was customary for crews on such trains to carry bedding and food for emergencies, but the train was allowed to proceed to its terminal 54 miles distant before the crew was relieved, the railroad did

---

⬤➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

not exercise the full measure of diligence required in minimizing the excessive service.

**4. Master and servant ⊕13—Hours of Service Act held not violated because wrecking train picked up some cars.**

While wrecking or relief trains are not immune from the provisions of Hours of Service Act (Comp. St. §§ 8677–8680), when engaging substantially in commercial service, the act *held* not violated because a wrecking crew picked up a few cars, both on its way to a wreck and on its return; it not appearing what time, if any, was lost in so doing.

**5. Commerce ⊕8(5)—Hours of Service Act inapplicable to employees on intrastate train.**

The Hours of Service Act (Comp. St. §§ 8677–8680) applies only to employees directly or indirectly engaged in interstate traffic at the time of the alleged violation, and not to employees engaged in operation of an intrastate train, though the railroad is engaged in operating both kinds of trains.

**6. Commerce ⊕27(6)—Intrastate train held not impressed with interstate character within Hours of Service Act.**

That an intrastate train followed an interstate train, and received some assistance from it in extricating itself from a blockade, *held* not to create such interdependent relation between the two trains as impressed the intrastate train with an interstate character and brought it within the Hours of Service Act (Comp. St. §§ 8677–8680), where its crew did nothing other than to accomplish the movement of its own train.

In Error to the District Court of the United States for the District of Wyoming; T. Blake Kennedy, Judge.

Action by the United States against the Colorado, Wyoming & Eastern Railway Company. Judgment for defendant, and plaintiff brings error. Affirmed in part, and reversed and remanded in part.

Albert D. Walton, U. S. Atty., of Cheyenne, Wyo., and M. C. List, Sp. Asst. U. S. Atty., of Washington, D. C. (Clyde M. Watts, Asst. U. S. Atty., of Cheyenne, Wyo., on the brief), for the United States.

N. E. Corthell, of Laramie, Wyo., for defendant in error.

Before STONE and LEWIS, Circuit Judges, and VAN VALKEN-BURGH, District Judge.

VAN VALKENBURGH, District Judge. This case arose under the Act of Congress approved March 4, 1907 (34 Statutes at Large, p. 1415 [Comp. St. §§ 8677–8680]), commonly known as the Hours of Service Act. The petition contains twelve counts, covering three separate transactions. In each transaction the four members of the train crew, to wit, the engineer, fireman, conductor, and brakeman, were involved; the alleged excessive service of each being made the subject of a separate count. A jury was waived in writing, and the case was submitted to the court upon an agreed statement of facts, upon which the court rendered judgment for defendant on all counts. For purposes of convenience each transaction will be considered separately.

The first train, known as "Freight Train Extra East" was hauled by engine No. 8 from Northgate, Colo., to Laramie, Wyo., on October 14 and 15, 1920; each of the employees, severally named in the first four counts of the petition, was on duty continuously from 11 o'clock a. m. on October 14, 1920, to 7:20 p. m. October 15, 1920, greatly in

excess of the statutory period of 16 hours. The agreed statement of facts pertaining to this train movement, aside from the formal recitals, is as follows:

"That said train crew with its train left Northgate, Colo., at 11:45 a. m. on October 14th, and after proceeding a distance of about 11 miles, was delayed 20 hours and 20 minutes on account of C. & A. coal car No. 38411 being de- railed at mile post 68½, said derailment being caused by soft track due to a snowstorm which was in progress at the time said crew left Northgate, Colo. That thereafter the said crew arrived at Fox Park, Wyo., at about 1:20 p. m. October 15, 1920, and departed from Fox Park at 2 p. m. on said date, ar- riving at Laramie and going off duty at 7:20 p. m.

"That Fox Park is a station in Wyoming on defendant's line of railroad 54.6 miles distant from Laramie, at which place there is a wye, coal, water, and side track capacity for 76 cars. That during the month of October, 1920, the crews of twenty-three trains took rest at Fox Park, of which number thirteen consisted of the crew of a train chartered by said company to tie con- tractors, and which during that period were stationed at Fox Park engaged in taking empty cars out from said station to points on the main line, where the same were loaded with ties and returned to Fox Park. That the crew in charge of such train during that period were equipped with bedding and food and took their rest and food in the caboose. The remainder of such trains consisted of two regularly scheduled trains and eight extra trains. It was customary for the crews on such trains to carry bedding and food in a caboose for emergencies, and these facilities were used when the trains were tied up for rest at all points.

"That all train crews were generally instructed to tie up the train at any point for rest at any time whenever the 16-hour limit was reached, unless special orders to the contrary were given. That the only means of affording rest for the crews concerned in this cause of action was to tie up at Fox Park, or at other way station on the line, where facilities for rest were less than at Fox Park, or to proceed to Laramie.

"That the officers of the defendant company made no effort, upon the ar- rival of said train at Fox Park, to relieve said crew, or release said crew from duty, or any other measures to prevent further excess service, otherwise than by continuing to the terminal at Laramie, due to there being no relief crews available nearer than Laramie, which could have been sent out on train No. 1, scheduled to arrive at Fox Park at 1 p. m. October 15, 1920, and instructed the crew to proceed to Laramie."

[1] It was conceded at the argument that a situation amounting to unavoidable accident, within the proviso of section 3 of the act, was present, and that there was unavoidable delay to the train by reason thereof. The contention of the government is, however, that the pro- viso does not license the carrier—

"to continue the crew thereof on duty until they reach the end of their run, and whenever any such delay occurs the carrier must continue to exercise a high degree of care, either to prevent any excess service, or to make it as short as possible. The burden is on the defendant to negative all forms of relief."

It is the contention of the railroad that the admitted casualty ex- cludes the case from the act; that negligence in providing relief is not in issue; that relief is not required by the act until a terminal is reached; that in the present case there was no opportunity to secure relief either from Laramie or at Fox Park. The trial court adopted the view of de- fendant in error.

The courts of the United States, district and appellate, are so over- whelmingly in harmony with respect to the necessity of minimizing the excess of service, even in cases where some excess is excused by

the proviso, that defendant's first three contentions above stated are no longer entitled to consideration. The case of Atchison, Topeka & Santa Fé Railroad v. United States, 244 U. S. 336, 37 Sup. Ct. 635, 61 L. Ed. 1175, Ann. Cas. 1918C, 794, is decisive upon this point, wherein the Supreme Court said:

"It must be remembered that the purpose of the act was to prevent the dangers which must necessarily arise to the employee and to the public from continuing men in a dangerous and hazardous business for periods so long as to render them unfit to give that service which is essential to the protection of themselves and those intrusted to their care. * * *

"It was not the intention of the proviso, as we read it, to relieve the carrier from the exercise of diligence to comply with the general provisions of the act, but only to relieve it from accidents arising from unknown causes which necessarily entailed overtime employment and service. United States v. Dickson, 15 Pet. 141. It is still the duty of the carrier to do all reasonably within its power to limit the hours of service in accordance with the requirements of the law."

The train in that case, in charge of the crew subjected to excess service, was proceeding from Parker, Ariz., to Los Angeles, Cal. The terminal for the passenger train crew engaged in the operation of this train was Los Angeles. En route it passed through San Bernardino, where opportunity for relief and rest existed. By reason of unavoidable delays the crew had been kept continuously in service for 18 hours and 50 minutes when the train arrived at San Bernardino. Instead of stopping for rest or procuring a change of crew, the train proceeded to Los Angeles, whereby 2 hours and 55 minutes additional were consumed. The court held that the railroad company was liable for its failure to minimize the excess service by affording relief at San Bernardino.

It will be seen that when the train reached San Bernardino there was an excess of service of 2 hours and 50 minutes. It was conceded that this had been due to unavoidable accident and unforeseen delay along the line; but the court held that the obligation to minimize the excess of service, and to use all reasonable diligence to avoid the consequences of the unavoidable accident which had delayed the movement of the train, was a continuing one which demanded the earliest possible satisfaction. Los Angeles was the terminal within the purview of the law. San Bernardino may have been a "terminal" in a certain restricted sense, but San Bernardino was not fixed upon by the Supreme Court because it was a terminal of any sort, but because it was a place where relief could be afforded. For the further elaboration of the doctrine see Denver & R. G. R. Co. v. United States (C. C. A.) 270 Fed. 63; Gulf, C. & S. F. Ry. Co. v. United States, 255 Fed. 753, 167 C. C. A. 99; Baltimore & O. R. Co. v. United States, 242 Fed. 1, 154 C. C. A. 593.

[2] But counsel for defendant in error contends that its negligence in providing relief, if any, is not in issue for the reason that no such negligence was charged or pleaded. In support of this contention the case of United States v. Missouri Pacific Ry. Co., 213 Fed. 169, 176, 130 C. C. A. 5, 12, is cited. But in that case counsel were held to be estopped by their demurrer which admitted this averment of the answer:

"That through no fault or negligence of the defendant company, its agents, or servants, a derailment occurred on the line of the defendant."

Reference was made to the prior decision of this court in United States v. Kansas City Southern Ry. Co., 202 Fed. 828, 121 C. C. A. 136; and the doctrine announced in the latter case was in no sense impaired or discredited. It was there held (202 Fed. loc. cit. 832, 121 C. C. A. 140):

"The burden was upon the government to establish that the defendant had required or permitted its employees to remain on duty longer than 16 hours; this, being conceded, made a prima facie case. The excuses embodied in the proviso are separate and affirmative defenses (C., B. & Q. R. Co. v. U. S., 115 C. C. A. 193, 195 Fed. 241), which must be pleaded in the answer; and the burden is upon the defendant to sustain such allegations."

[3] This brings us to the contention of defendant in error that there was no opportunity to secure relief. It appears from the agreed statement of facts that it became evident long before Fox Park was reached that the train would be delayed beyond the statutory period. It is true that after arrival at Fox Park at 1:20 p. m. it would have been impossible to communicate with Laramie and secure relief by train to arrive at Fox Park at 1 p. m. It does not appear from the agreed statement of facts, however, that it would have been impossible to communicate with Laramie prior to arriving at Fox Park in time to procure a relief crew to be sent, whether upon train No. 1 or otherwise.

But, however this may be, it appears from the agreed statement that during this month of October, 1920, the crews of twenty-three trains took rest at Fox Park; that it was customary for the crews on such trains to carry bedding and food in a caboose for emergencies, and these facilities were used when a train was tied up for rest at all points. Throughout the argument reference was repeatedly made to the difficulties of travel over this road during the winter season, because of the deep snows that are frequently encountered. It does not appear whether this train was equipped in the usual manner with food and bedding. If it was, then the facilities for rest were present. If it was not so equipped, then there was a departure from what is stated to be the usual custom. As this court said in United States v. Kansas City Southern R. R. Co., supra:

"At all times the carrier has been held to the exercise of due diligence and foresight. The degree of such diligence, foresight, and care required depends largely upon the object aimed at and the situation presented; and whether the defendant has discharged the full duty laid upon it is to be determined from the facts and circumstances in each case."

In view of this holding and of the burden cast upon the defendant in error under the proviso, we cannot say that the defendant below, upon the record presented, exercised that full measure of diligence in minimizing excessive service on the part of its employees which the law requires. Our conclusion is that upon the first four counts of the petition the judgment below must be reversed and the cause remanded for a new trial.

[4] Counts 5 to 8, inclusive, have to do with a wrecking train of the nature excepted from the provisions of the act by the second proviso

of section 3 thereof. The government contends that this train lost its identity as such, and the protection of the proviso, by reason of the fact that, both going from and returning to Laramie, it picked up and hauled a few cars which formed no part of its wrecking outfit.

We have no disposition to depart from the accepted rule that wrecking or relief trains cannot be permitted to enjoy immunity from the provisions of the Hours of Service Act while engaging substantially in commercial service. Such a practice, if recognized and permitted in the decisions of the courts, would open a wide avenue of evasion. Nevertheless, we do not believe the record in this case sufficiently establishes such a forbidden practice. It is not made to appear what time, if any, was lost in picking up the additional cars. Some switching had to be done at Fox Park in setting out there the B. & B. department outfit car and two cars of coal which had been rerailed. Incidentally, picking up the cars of ties and taking them to Laramie can scarcely be viewed as sufficient to convert this wrecking train into a commercial train, subject to the provisions of the Hours of Service Act. No more importance is to be attached to hauling the empty cars from Laramie to Fox Park, which was directly on the way to the point where the coal cars were to be rerailed. Our conclusion is that as to these four counts the judgment below should be affirmed.

[5] Counts 9 to 12, inclusive, have to do with a shipment wholly intrastate from Fox Park, Wyo., to Laramie, in the same state. The trial court held that this act of Congress has no application to employees engaged in the operation of this train. We think this ruling was right. It is true that the defendant railroad is at various times engaged in interstate as well as intrastate traffic and maintains a line of railroad running through and between different states; nevertheless the law applies only to such employees of the railroad as are engaged in interstate traffic, either directly or indirectly, at the time of the alleged violation of the Hours of Service Act. This is made clear by the Supreme Court in Baltimore & Ohio R. R. Co. v. Interstate Commerce Commission, 221 U. S. 612, loc. cit. 617, 31 Sup. Ct. 621, 624 (55 L. Ed. 878). It is there said:

"The definition in the second sentence, of what the terms 'railroad' and 'employees' shall include, qualify these words as previously used, but do not remove the limitation as to the nature of the transportation in which the employees must be engaged in order to come within the provisions of the statute. * * * In short, the employees to which the act refers, embracing the persons described in the last sentence of the section, are those engaged in the transportation of passengers or property by railroad in the district, territorial, interstate, or foreign commerce defined. * * *

"The statute, therefore, in its scope, is materially different from the Act of June 11, 1906, c. 3073 (34 Stat. 232), which was before this court in the Employers' Liability Cases, 207 U. S. 463. There, while the carriers described were those engaged in the commerce subject to the regulating power of Congress, it appeared that if a carrier was so engaged the act governed its relation to every employee, although the employment of the latter might have nothing whatever to do with interstate commerce. In the present statute, the limiting words govern the employees as well as the carriers."

[6] There was no such interdependence between this train and other trains upon this line of railroad as to bring the case within the doctrine

announced in Southern Ry. Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72. The crew of this train did nothing, as the court below said, other than to accomplish the movement of its own train. It is true that the train in controversy followed an interstate train into Laramie, and the latter, perhaps, rendered some assistance to the former in extricating itself from the blockade in the Fox Park yard. This, however, created no such interdependent relation between the two trains as would impress an interstate character upon the intrastate train. This case is not governed by the doctrine announced in Denver & Interurban Ry. Co. v. United States, 236 Fed. 685, 150 C. C. A. 17. There the employee was a telegraph operator who took messages for the passing of the Interurban trains with the interstate trains of a second railroad whose tracks the Interurban Company used. It was held that his duties were interstate in their character, and that intrastate and interstate duties were so commingled that the employment fell within the terms of the federal act. The decision of the Supreme Court in Southern Railway Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72, where the Safety Appliance Act (Comp. St. § 8605 et seq.) was under consideration, has no application to the situation here presented under an act in which the character of the employee affected is expressly limited. The mere operation of a purely intrastate train containing no interstate shipments is not "engaging in interstate commerce."

It follows from what has been said that upon counts 5 to 12, inclusive, judgment of the trial court should be affirmed, and that upon counts 1 to 4, inclusive, the judgment should be reversed and remanded for further hearing in accordance with the views herein expressed.