## UNITED STATES v. THOMPSON.

No. 12826.

Circuit Court of Appeals, Eighth Circuit.

Dec. 26, 1944.

476

Richard H. Musser, Asst. U. S. Atty., of Kansas City, Mo., and Leo Meltzer, Atty., Department of Justice, of Washington, D. C. (Tom C. Clark, Asst. Atty. Gen., Maurice M. Milligan, U. S. Atty., and Otto Schmid, Asst. U. S. Atty., both of Kansas City, Mo., and James O. Tolbert, Sp. Asst. to the U. S. Atty., and Irving Hill, Atty., Department of Justice, both of Washington, D. C., on the brief), for appellant.

James A. Potter, of Jefferson City, Mo. (Thomas J. Cole, of St. Louis, Mo., and Ragland, Otto & Potter, of Jefferson City, Mo., on the brief), for appellee.

Before GARDNER, WOODROUGH, and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

This civil action was brought under the Hours of Service Act of March 4, 1907, entitled "An act to promote the safety of employés and travelers upon railroads by limiting the hours of service of employés thereon." 45 U.S.C.A. §§ 61–64. Sections 62 and 63 read, in part, as follows:

"62. Hours of service limited. It shall be unlawful for any common carrier, its officers, or agents, subject to sections 61–64 of this title to require or permit any employees subject to sections 61–64 of this title to be or remain on duty for a longer period than sixteen consecutive hours, and whenever any such employee of such common carrier shall have been continuously on duty for sixteen hours he shall be relieved and not required or permitted again to go on duty until he has had at least ten consecutive hours off duty; * * *."

"63. Penalty; suits therefor; exceptions from operation of act. * * * Provided, That the provisions of sections 61–64 of this title shall not apply in any case of casualty or unavoidable accident or the act of God; nor where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employee at the time said employee left a terminal, and which could not have been foreseen: Provided further, That the provisions of this chapter shall not apply to the crews of wrecking or relief trains."

The plaintiff charged that defendant had violated section 62, by requiring and permitting five named employees connected with the movement of trains to be and remain on duty for a longer period than sixteen hours between the hour of 6:30 o'clock a.m., on March 31, 1942, and 5:50 a.m., of April 1, 1942. The defendant admitted that the named employees did remain on duty for a longer period than sixteen hours, as charged, but the defense was that they were, during all of the time, working as members of a crew of a wrecking train, and that by reason of the last proviso of section 63 the provisions of the Act relating to the limitation of hours of service did not apply to them.

On the trial of the case to the court without a jury, the facts were found as follows:

"That the defendant Guy A. Thompson was at all times mentioned in the complaint the duly appointed, qualified and acting trustee of the Missouri Pacific Railroad Company; that said railroad was at the time mentioned in the complaint, an interstate carrier of freight and passengers, operating lines of railway through the State of Missouri and adjoining states; that said company owns and operates a double track, main line railroad from the suburbs of St. Louis, Missouri, to the City of Jefferson, where a division point is maintained; that said company also operates two lines of railroad from Jefferson City, Missouri, to Kansas City, Missouri; that one of the lines of railroad from Jefferson City to Kansas City is called the river route and the track is laid along the south bank of the Missouri River; that the other line of railroad from Jefferson City to Kansas City, Missouri runs over the hills and prairies through the towns of California, Sedalia, Warrensburg and other points, and merges with the river route at Kansas City; that the river route is a water grade line of railroad, while the overland route between Kansas City and Jefferson City has numerous excessive grades for freight service; that practically all of the freight received by the Missouri Pacific at Kansas City, Missouri, and points beyond, destined for St. Louis, is, and was routed by the railroad company over its river route because of the low grade and because of the fact that one

train on such route can do the work of three to five trains over the overland route between the same points; that said river route is a one-track railroad; that on the morning of March 24, 1942, a wreck occurred on the said river route of the defendant at a point about three miles east of Boonville, Missouri and about 41 miles west of Jefferson City, Missouri; that approximately 35 or 40 cars were derailed, some of which were totally destroyed and others of which were repaired and later removed from the scene of the wreck; that the derailed cars were loaded with all kinds of merchandise, including some 800 head of livestock, one or more loads of fresh meat, fresh salmon, cabbage and other articles of food; that approximately 160 head of livestock were killed and scattered along the right-of-way and mixed with the debris of the wreck.

"The Court further finds that at Jefferson City, Missouri, the defendant continuously maintains a wrecking train, which is ready for service at all times; that said wrecking train consists of a wrecker outfit mounted on wheels, a car carrying a tank of water, another car loaded with car trucks, another car loaded with all kinds of wrecking equipment ordinarily used in cleaning up a wreck, and another car containing ties, rails, spikes and other materials commonly and generally used in the performance of a wrecking train; that such train also includes a commissary car where meals can be cooked and served to the members of the wrecking train crew; that said train is maintained at all times for immediate use, and steam is kept alive in the boiler of the wrecker at all times; that as soon as notice of the wreck was received at Jefferson City, Missouri, the Trainmaster called the individuals named in the complaint herein, as members of the crew of said train, and ordered the train to proceed to the scene of the wreck; that the Trainmaster accompanied the train and remained with it until the work of restoring the track and cleaning up the wreck was completed; that the wrecking train arrived at the scene of the wreck on the morning of March 24, 1942; that this wrecking train worked on the east end of the wreck, while a similar wrecking train from Kansas City worked on the west end of the wreck; that the crews of both wrecking trains first made a pathway through the wreckage in order that the wrecking trains could move over the track between the wrecked cars, and in order

that regular freight trains might pass the scene of the wreck; that a temporary track was laid for this purpose, to one side of the regular road bed; that this temporary passageway was completed late in the morning of March 25 and the wrecking trains crews then took a rest; that they resumed the work of clearing the wreck on March 26 and continued the same work on the 27, 28, 29 and 31 of March; that the members of the wrecking train mentioned in the complaint began work on March 31 at 6:30 a.m. and continued their work at the scene of the wreck until about 10 p.m. the same day, at which time they moved their train to Boonville, a distance of three miles to the west, arriving at Boonville at 10:15 p.m.; that upon arriving at Boonville the crew was fed, the engine was watered and coal was taken; that at the time there were approximately 29 cars which were damaged in the wreck standing on the only passing track at Boonville, Missouri; that many of these cars had no drawbars nor brakes; that they could not be put in any train and had to be chained together in order to be moved; that after the crew had eaten its meal at Boonville on the night of March 31, the members thereof proceeded to tie the damaged cars together with chains, and under the instructions of the Trainmaster in charge, the wrecking train departed from Boonville about 1:35 a.m., on April 1 and arrived at Jefferson City at 5:50 a.m., on April 1.

"The Court finds that the wrecking train included no cars other than cars loaded with supplies to be used in clearing the wreck on its journey from Jefferson City to the scene of the wreck, and that this wrecking train contained no cars upon its return from Boonville, Missouri to Jefferson City, Missouri, except the cars constituting the regular wrecking train and the cars damaged in the wreck and loaded with debris gathered at the scene of the wreck; that all of the cars damaged in the wreck were destined for Sedalia, Missouri, where they could be repaired, and all the cars loaded with scrap and junk were also destined for Sedalia, Missouri.

"The Court further finds that it was reasonably necessary, under the facts shown by the evidence, to remove expeditiously the damaged freight cars from the yards at Boonville so that the passing tracks there could be used in regular railroad service, and that it was necessary to return the wrecking train to Jefferson City promptly

so that it could be resupplied with materials which might be needed at any time for similar service, should same be necessary, on any other part of the railroad."

The Court's conclusion of law was: "The Court finds that under the pleading, the evidence and the law involved in this case, the employees named in the complaint were members of the crew of a wrecking train, within the meaning of the law, until such wrecking train arrived at Jefferson City, Missouri at 5:50 a.m. on April 1, 1942, and that the members of such crew were not subject to the 16-hour law until the wrecking train returned to Jefferson City, Missouri at the time above stated, and that judgment herein should be rendered in favor of the defendant."

In announcing its decision in favor of defendant orally from the bench, the court stated, i. a.: "It seems to me that the wrecking crew cannot be a wrecking crew after the emergency type of the service which is incident to the wrecking crew's work has ceased, so the question seems to me to be when does the type of work which makes the work of a wrecking or relief train urgent for emergency cease to fall within the classification of emergency work of the wrecking or relief crew and take on the characteristic of a work crew which engages in normal, ordinary repair work. Applied more specifically to this case, is the clearing of debris caused by a wreck, after normal traffic conditions have been restored, work of a wrecking or relief crew, or the work of an ordinary work crew. And, if so, is the expeditious routine return of the wrecking or relief train on to its base or headquarters a part of the emergency service, or merely the routine movement after the emergency type of service has ceased. It seems to me, that the commonsense view is that the type of the service which gives to the work of the crew of a wrecking train the characteristic of being emergency service must continue until the wreck train or relief train has fully completed its mission and returned to its original base or headquarters, if that return is, of course, without unnecessary delay or interruption. Otherwise stated, if the return is an expeditious, routine movement of the wreck train and incident to the movement of all wreck trains as a part of each emergency caused by an individual wreck. It seems to me that the return of the wreck train, the re-supplying of it, as a routine part of its work, must be a part of the work of a wreck train, the crew operating it must still be working as a wreck or relief crew."

## Opinion

It was argued that the wording of the proviso on which this case turns—"That the provisions of this chapter shall not apply to the crews of wrecking or relief trains," includes no restrictions, and so it might permit the conclusion that once a man is identified as one of a crew of a wrecking train he could at all times be permitted to work more than sixteen hours continuously. But the District Court clearly recognized that the words were not to be so read in isolation. The proviso does not define "wrecking train", either in terms of staff and equipment or of function, and the court rightly sought to ascribe a meaning to the proviso in accord with the Act as a whole. The purpose of the statute is to suppress the dangers of excessive working hours in railroad employment by imposing penalties against railroads which permit them, and the purpose of the proviso is to except from the penalties the emergency work that is entrusted to and performed by crews of wrecking or relief trains. We approve of the trial court's statement that "the wrecking crew can not be a wrecking crew after the emergency type of the service which is incident to the wrecking crew's work has ceased", and we hold that the exception of the proviso does not save the railroad from the penalties of the statute in the case of members of crews of wrecking trains unless the emergency implied in the use of the words "crews of wrecking trains" actually exists and their work is related to it.

This interpretation was clearly indicated in this court's opinion in United States v. Colorado, Wyoming & E. R., 8 Cir., 292 F. 916, 921. Although the precise question here submitted was not directly involved, the court clearly recognized that the wrecking train proviso was not to be read as giving the railroad absolute immunity from the hours of service limitations in respect to crews of wrecking trains. In that case the wrecking train crew had added a few commercial cars to its train. It did not appear that there was substantial deviation from the wrecking train emergency function, but it is plainly intimated that if there had been substantial deviation violation would have existed. "Such a practice, if recognized and permitted in the decisions

of the courts, would open a wide avenue of evasion."

But the main dispute involved in this appeal arises upon the government's contention that the assembling of the damaged cars at Boonville and handling them from there to Jefferson City was not the work of a wrecking train crew in that it is insisted that as soon as the two wrecking train crews, one from Kansas City and the other from Jefferson City, had restored the railroad at the immediate scene of the wreck to fitness for traffic, the element of emergency or urgency ceased to be present and the limitation on work hours became effective.

As stated, the trial court met this contention with its finding and conclusion to the effect that from the time the five employees named in the complaint left Jefferson City to the time they got back they remained a "crew of a wrecking train", and that all that they did had to be done "expeditiously" and "promptly."

■ It is settled that notwithstanding the Act contains civil penalties, "[it] is remedial and in the public interest, and should be construed in the light of its humane purpose," Atchison, T. & S. F. R. v. United States, 244 U.S. 336, loc. cit. 343, 37 S.Ct. 635, loc. cit. 637, 61 L.Ed. 1175, Ann.Cas.1918C, 794, and its provisos which allow exceptions under which the railroads are relieved from the general application of the requirements must be strictly construed. As to the proviso immediately preceding the one here involved, the Supreme Court said: "It was not the intention of the proviso, as we read it, to relieve the carrier from the exercise of diligence to comply with the general provisions of the act, but only to relieve it from accidents arising from unknown causes which necessarily entailed overtime employment and service. United States v. Dickson, 15 Pet. 141, 10 L.Ed. 689. It is still the duty of the carrier to do all reasonably within its power to limit the hours of service in accordance with the requirements of the law." Ibid, 244 U.S. loc. cit. 343, 37 S.Ct. loc. cit. 637.

We think the expressions are also applicable to the proviso here involved and that the carrier must be held to a similar high degree of duty to wrecking crews in respect to any work such crews are put to outside of the urgent necessities or emergency service implied in the designation "crews of wrecking trains." Whether a

particular task assigned to such a crew falls within or outside the dividing line must, in many cases, remain a question of fact. In the absence of definition by Congress of specific limitations of the functions of a wrecking train, the court must take into account the understanding of the description by railroad men using railroad parlance. In this case the trainmaster, Mr. B. W. Smith, who took charge when the wreck occurred, testified that during all of the period between leaving and getting back to Jefferson City, the crew did "no work only incidental to the wreck itself," and that all their work was "incidental to the wreckage."

Another witness, in answer to the question whether the crew had performed any work during the period, except such work as was necessary to clean up the wreck and return with the cars involved in the wreck and the wrecking outfit, answered: "No other work except for the wrecker and the wrecked cars."

Although the evidence does not show exactly what facilities there were at Boonville where the damaged cars, wreckage and salvage were accumulated during the wrecking work, it is clear from Mr. Smith's testimony that he deemed it necessary to get the accumulation away from there without delay, and that he had the Kansas City wrecking train haul a part to Kansas City while the other crew hauled the rest to Jefferson City. There was no evidence that it would have been safe or orderly to leave it at Boonville, and Mr. Smith was positive that it could not lawfully be hauled in an ordinary or revenue train.

It must be recognized that there was some difference in the degree of urgency as to the particular tasks performed by the crew of the wrecking train described in the court's findings, and the gist of the contention for the government is that the several stages of the work of restoring the road for traffic, cleaning up at the scene of the wreck and hauling away the remains, ought to be regarded as distinct and separate. It would concede emergency or urgency sufficient to excuse the long hours only to the stage when a temporary passageway for traffic was gotten through the wreckage, or perhaps to the stage of getting the tracks and the immediate scene of the wreck cleared away. It insists that after that the emergency of the wreck was passed, that it was then reasonably in the power of the railroad to supply other agen-

cies to finish the work the wreck gave rise to, and the hours of service act applied.

But we find no precedent to require a ruling that the court erroneously applied the law in refusing to distinguish to that extent between the work that was done at the immediate scene of the wreck and at Boonville where the remains were temporarily accumulated, or on the road back to Jefferson City. Conceding that there was some difference in the degree of urgency at the several stages of the operation, the evidence presents no clear and positive lines of demarcation to differentiate the work so that it may be said with certainty —"This is emergency work, and that is not." There is no hint in the record that there were any other reasons for the night movement back to Jefferson City other than the necessity of getting the damaged stuff out of the way at Boonville and getting the wrecking train back to its location and restocked for its next emergency call. There was no real cessation of urgency and necessity for prompt action, but rather a continuing necessity for effort to abate the wreck emergency and restore normalcy.

We recognize that when the wrecking crew in this case made the journey from Boonville to Jefferson City it created the condition of menace to the travelling public upon the main line of track which the Act and the courts applying the Act have sought to prevent. Instrumentalities that require a high degree of care and alertness in their operation were committed to men who had been too long on duty.

But the occasion was exceptional and extraordinary. A veteran railroad man testified: "It was the worst wreck I think I ever saw." It took two wrecking trains more than a week to clean up after it, and the wrecking materials of the train in question were used up in the process. Trains were bunched up and traffic was delayed, and there was wide departure from normal operations.

It need not be held the operations of removing the remains of a wreck to the nearest terminal and restoring the wrecker to its state of readiness for emergency, are always to be deemed within or without the function of a wrecking train. We hold that in this case the court rightly appraised the applicable law; that its inferences from the circumstances under which the work was done at Boonville and the train was moved to Jefferson City were not unreasonable, and that the evidence affords substantial support for the judgment.

Affirmed.