**UNITED STATES of America,**
**Plaintiff,**

v.

**The NEW YORK CENTRAL RAILROAD COMPANY, Defendant.**

**Civ. A. No. 66-CV-426.**

United States District Court
N. D. New York.

Oct. 31, 1967.

———◆———

George B. Burke, Asst. U. S. Atty., Albany, N. Y. (Justin J. Mahoney, U. S. Atty., Albany, N. Y., on the brief), for plaintiff.

Howard S. Munson, of Hiscock, Cowie, Bruce, Lee & Mawhinney, Syracuse, N. Y., for defendant.

TIMBERS, District Judge.*

## QUESTION PRESENTED

In this civil action brought by the United States against The New York Central Railroad Company to recover penalties totalling $3,000, pursuant to the Hours Of Service Act, 45 U.S.C. §§ 61–64 (1964),[1] arising out of work per-

---

* Chief Judge of the District of Connecticut, sitting by designation.

1. Relevant sections of the Hours Of Service Act are:

 *45 U.S.C. § 62 (1964)*

 "It shall be unlawful for any common carrier, its officers, or agents, subject to sections 61–64 of this title to require or permit any employees subject to said sections to be or remain on duty for a longer period than sixteen consecutive hours, and whenever any such employee of such common carrier shall have been continuously on duty for sixteen hours he shall be relieved and not required or permitted again to go on duty until he has had at least ten consecutive hours off duty; and no such employee who has been on duty sixteen hours in the aggregate in any twenty-four-hour period shall be required or permitted to continue or again go on duty without having had at least eight consecutive hours off duty: *Pro-* *vided,* That no operator, train dispatcher, or other employee who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four-hour period in all towers, offices, places, and stations continuously operated night and day, nor for a longer period than thirteen hours in all towers, offices, places, and stations operated only during the daytime, except in case of emergency, when the employees named in this proviso may be permitted to be and remain on duty for four additional hours in a twenty-four-hour period on not exceeding three days in any week: *Provided further,* The Interstate Commerce Commission may after full hearing in a particular case and for good cause shown extend the period within which a common carrier shall comply

formed by six employees of defendant—concededly members of the crew of a wrecking train—during a period exceeding 16 consecutive hours on December 6 and 7, 1965, the question presented is whether defendant is exempt from the provisions of the Act by virtue of the last proviso clause of 45 U.S.C. § 63 (1964) which reads, *"Provided further,* that the provisions of said sections shall not apply to the crews of wrecking or relief trains."[2]

The Court holds that the employees here involved, although on duty for more than 16 consecutive hours, were engaged as members of the crew of a wrecking train under circumstances which Congress intended to exempt defendant from the provisions of the Act. Defendant accordingly is entitled to judgment dismissing the complaint, with costs.

After trial to the Court without a jury, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.

## FINDINGS OF FACT

(1) Defendant, The New York Central Railroad Company (hereinafter "the railroad"), at all times here involved, was a common carrier engaged in interstate commerce by railroad in the State of New York and within the jurisdiction of this Court.[3]

(2) The instant action to recover penalties for alleged violations by the railroad of the Hours Of Service Act (hereinafter "the Act") was timely brought by the United States Attorney for this District on November 18, 1966, within one year after the alleged violations are claimed to have occurred on December 6 and 7, 1965, between DeWitt and St. Johnsville, New York, within the jurisdiction of this Court.[4]

(3) At all times here involved, the following employees of the railroad constituted the crew (hereinafter "the DeWitt crew") of wrecking train No. Extra 8331, drawn by diesel locomotive No. 8331 and engaged in or connected with the movement of interstate commerce:[5]

Engineer G. E. Williams

Fireman C. H. Swanson

Conductor D. J. Pietro

Brakeman J. A. Cimino

Brakeman S. T. Spadaro

Brakeman R. F. Hasso

(4) By the instant action, the United States (hereinafter "the government") seeks recovery of penalties from the railroad totalling $3,000 ($500 for each of the six members of the DeWitt crew) on

---

with the provisions of this proviso as to such case."
*45 U.S.C. § 63 (1964)*
 "Any such common carrier, or any officer or agent thereof, requiring or permitting any employee to go, be, or remain on duty in violation of section 62 of this title shall be liable to a penalty of not less than $100 nor more than $500 for each and every violation, to be recovered in a suit or suits to be brought by the United States attorney in the district court of the United States having jurisdiction in the locality where such violations shall have been committed; and it shall be the duty of such United States attorney to bring such suit upon satisfactory information being lodged with him; but no such suit shall be brought after the expiration of one year from the date of such violation; and it shall also be the duty of the Interstate Commerce Commission to lodge with the proper United States attorney information of any such violations as may come to its knowledge. In all prosecutions under sections 61–64 of this title the common carrier shall be deemed to have knowledge of all acts of all its officers and agents: *Provided,* That the provisions of said sections shall not apply in any case of casualty or unavoidable accident or the act of God; nor where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employee at the time said employee left a terminal, and which could not have been foreseen: *Provided further,* That the provisions of said sections shall not apply to the crews of wrecking or relief trains."

2. Supra note 1.

3. 45 U.S.C. §§ 61, 63 (1964).

4. 45 U.S.C. § 63 (1964).

5. 45 U.S.C. §§ 61, 63 (1964).

the ground that the railroad required or permitted that crew to remain on duty for a period longer than 16 consecutive hours, i. e. from 11:45 P.M. on December 6, 1965 to 7:10 P.M. on December 7, 1965.[6]

(5) By its answer, the railroad denies the material allegations of the complaint, except it admits that at all times here involved it was engaged as a common carrier in interstate commerce by railroad in the State of New York; and it alleges as an affirmative defense that the employees named in the complaint were members of the crew of a wrecking train and as such were specifically exempt from the Act.[7]

(6) At some time before midnight on the night of December 6, 1965, a wreck occurred on the railroad's main line at CP–18, approximately two miles east of St. Johnsville, New York; the wreck involved the 55 car eastbound freight and coal hopper train BA–2, 14 cars of which were derailed and tipped over due to a burned out journal; the wreck blocked all traffic on the eastbound and westbound main tracks (tracks 1 and 2).

(7) In order to clear the tracks of the wreck, the railroad ordered one wrecking train to proceed from Selkirk (near Albany) to the east end of the wreck and a second wrecking train (the crew of which is the subject of the instant action) to proceed from DeWitt (near Syracuse) to the west end of the wreck. The distance between DeWitt and Selkirk is approximately 142 miles. The distance between DeWitt and the scene of the wreck is approximately 80 miles.

(8) The DeWitt crew originally had been ordered to report at 11:45 P.M. on December 6, 1965 to work train NY–4, a scheduled freight train of 103 cars, on its normal 3½ to 4 hour run from DeWitt to Selkirk. Due to the wreck, however, the DeWitt crew at 12:01 A.M. on December 7, 1965 was ordered instead to work a wrecking train consisting of a steam crane, locomotive and 6 cars.

(9) The DeWitt wrecking train and crew left DeWitt at 12:25 A.M. and arrived at the west end of the wreck at approximately 4:30 A.M., thus taking 4 hours to travel a distance normally covered in 1 hour and 30 or 50 minutes. After another hour or so—described by the conductor as time required to get the steam crane started on a cold morning—the DeWitt wrecking train and crew actually got started working at the scene of the wreck at 5:40 A.M. This crew left the scene of the wreck at 2:30 P.M. to return to DeWitt where it arrived at 7:10 P.M.—19 hours and 9 minutes after it had been first ordered to work the wrecking train. The length of time required for the return trip (4 hours and 40 minutes) was due in part to the 20 m. p. h. speed restriction necessitated by the hauling of crippled cars and in part to having been side-tracked at Rome to permit one or more through trains to pass.

(10) When the DeWitt crew left the scene of the wreck at 2:30 P.M., one of the main line tracks (track 1) was clear, but the other track (track 2) had not yet been cleared; the crew of the Selkirk wrecking train at that time was still engaged in clearing track 2.

(11) During the period that the DeWitt crew was under orders as the crew of a wrecking train, two or three members of that crew persisted in almost continuous griping with the crew's immediate supervisor, Mr. L. C. Lytle, transportation superintendent of the railroad's Mohawk Division. The genesis of the griping appears to have been displeasure on the part of certain members of the crew at having been ordered to work the DeWitt wrecking train rather than train NY–4. Eventually the griping became focused upon Lytle's refusal to relieve them, although a relief crew had been ordered and subsequently cancelled. According to Lytle, the DeWitt crew had been "giving him the business throughout the day." And so it had.

6. 45 U.S.C. §§ 62, 63 (1964).

7. 45 U.S.C. § 63 (1964).

(12) When the DeWitt crew first arrived at the scene of the wreck, Lytle was disturbed because the west end crane (DeWitt wrecking train) had arrived at the scene of the wreck so much later than the east end crane (Selkirk wrecking train); Lytle asked conductor Pietro what had taken them so long, but received no reply.

(13) Sometime before noon, conductor Pietro and brakeman Cimino asked Lytle if the DeWitt crew was going to be relieved; Lytle replied that, although a relief crew had been called, he had cancelled it because the DeWitt crew would have plenty of time to clean up the wreck, handle their cars and get back to DeWitt.

(14) About 1:20 P.M., Pietro and Cimino attempted to persuade one Joslin, the supervisor of the Selkirk wrecking train at the east end of the wreck, to relieve the DeWitt crew; Joslin referred them back to Lytle who was supervising the DeWitt crew.

(15) About 1:30 P.M., Pietro and Cimino gave Lytle what Pietro described as a "14 hour message": that their time would be up at 4:01 P.M. and they were giving Lytle 2 hours to get a crew ready to relieve them; Lytle told them "to get on the outfit and get out of town", that they "had plenty of time to take the train to DeWitt."

(16) Still not satisfied with what Lytle had told them, Pietro and Cimino walked ten car lengths to a maintenance shanty and called chief dispatcher Guy Smith in an attempt to persuade him to overrule Lytle's decision not to relieve the DeWitt crew; Smith declined to do so. This maneuver consumed 15 to 20 minutes. Eventually, more than an hour after Lytle had ordered them to leave, the DeWitt crew left for DeWitt where they arrived at 7:10 P.M.

(17) Enroute to and from the wreck, the DeWitt crew rode in a dining car. They had taken on groceries before leaving DeWitt. They were adequately dressed for the weather. They were paid straight time for the first 13 hours, time and a half for the balance.

(18) The relief crew originally called to relieve the DeWitt crew reported at the railroad's Albany passenger station at 11:00 A.M. and was awaiting transportation to the scene of the wreck; subsequently the order for this relief crew was cancelled; they were sent home and paid for 50 miles.

(19) James F. Sheridan, a safety agent of the Department of Transportation, Federal Railroad Administration,[8] interviewed transportation superintendent Lytle on September 13, 1966. Lytle told Sheridan that he had called a relief crew to relieve the DeWitt crew but had cancelled the relief crew, believing the DeWitt crew could make it back to DeWitt in time, i. e. before the expiration of 16 hours. Lytle also told Sheridan that he believed the Selkirk wrecking crew was doing a better job at the scene of the wreck than the DeWitt wrecking crew was doing. And, finally, Lytle said it was his understanding of the law that he did not have to relieve the crew of a wrecking train, that he could work such a crew for more than 16 hours.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction over the subject matter of, and the parties to, this action.

(2) The six employees of the railroad named in the complaint were members of the crew of a wrecking train within the meaning of the wrecking train proviso clause of 45 U.S.C. § 63 (1964).[9]

(3) Although the railroad permitted said employees to remain on duty for more than 16 consecutive hours, they were engaged as members of the crew of a wrecking train under circumstances which Congress intended to exempt the

8. Duties formerly performed by the Interstate Commerce Commission under the Act (e. g. supra note 1) are now performed by the Federal Railroad Administration.

9. Supra note 1.

railroad from the provisions of the Act.[10]

(4) In permitting said employees to remain on duty for more than 16 consecutive hours, the railroad did not act arbitrarily or capriciously; but, on the contrary, the railroad acted diligently, in good faith and well within the margin of managerial judgment entrusted to the railroad by the wrecking train proviso of the Act.[11]

(5) Upon the entire record, the railroad did not violate the Act.

(6) The railroad is entitled to judgment dismissing the complaint, with costs.[12]

## OPINION

This case, so far as the precise question here presented is concerned, appears to be one of first impression.

*Purpose of the Act*

█ The purpose of the Hours Of Service Act,[13] first enacted in 1907, in limiting the on-duty hours of railroad employees involved in the movement of trains, is to promote safety "by preventing the excessive mental and physical strain which usually results from remaining too long at an exacting task." Chicago & Alton R. R. Co. v. United States, 247 U.S. 197, 199 (1918). Although civil penalties are provided for violations of the statute, it nevertheless "is remedial and in the public interest, and should be construed in the light of its humane purpose." Atchison, T. & S. F. Ry. Co. v. United States, 244 U.S. 336, 343 (1917). The lower federal courts accordingly have been careful liberally to construe the statute so as to subserve its essential purpose. See, e. g., United States v. Baltimore & O. R. Co., 133 F.2d 831, 839 (4 Cir. 1943); United States v. Northern Pac. Ry. Co., 224 F.Supp. 303 (D.Minn.1963).

There is no dispute between the parties to the instant action as to the essential purpose of the Act; but such descriptions of the legislative purpose as "remedial", "humane" and "in the public interest" are not particularly helpful in construing what appears, to this Court at least, to be the unambiguous exemptive language of the last proviso clause of 45 U.S.C. § 63 (1964): *"Provided further,* that the provisions of said sections shall not apply to the crews of wrecking or relief trains." [14] Given such language and the stipulation of the parties that the crew here involved was a wrecking train crew, there would appear to be not much more to say.

The government, however, makes two arguments in support of its claim that, upon the facts here presented, the railroad is not exempt by virtue of the wrecking train proviso: (1) that the emergency had ceased when the DeWitt crew was ordered at 1:30 P.M. to leave the scene of the wreck and to return to DeWitt; and (2) that the cancellation of the relief crew, after it had been called and had reported for duty, demonstrates that the railroad acted arbitrarily, capriciously and not in good faith.

*Claim That Emergency Had Ceased*

█ This claim can be disposed of summarily. Lytle at 1:30 P.M. ordered the DeWitt crew to leave the scene of the wreck and to return to DeWitt; at that time both main line tracks were out of service because of the derailed cars. When the DeWitt crew actually left the scene of the wreck at 2:30 P.M., after delaying for approximately an hour, one of the main line tracks (track 1) was clear, but the other track (track 2) had not yet been cleared; the crew of the Selkirk wrecking train at that time was still engaged in clearing track 2. The DeWitt wrecking train hauled a number of

10. Id.

11. Id.

12. Rule 54(d), Fed.R.Civ.P.; 28 U.S.C. § 2412 (Supp. II, 1965–66).

13. 45 U.S.C. §§ 61–64 (1964).

14. Supra note 1.

crippled cars from the scene of the wreck to DeWitt where it arrived at 7:10 P.M.

■ It is elemental that the crew of the DeWitt wrecking train was engaged as such, within the meaning of the wrecking train proviso of the Act, from the time it was ordered at 12:01 A.M. at DeWitt to work a wrecking train, consisting of a steam crane, locomotive and 6 cars, until it returned to DeWitt 19 hours later at 7:10 P.M., including the time getting to the scene of the wreck, the time working at the scene of the wreck and the time hauling crippled cars back to DeWitt. The entire 19 hour period is properly charged to the emergency created by the wreck; during no part of the 19 hour period was the DeWitt crew engaged in "commercial service" as distinguished from "emergency service". United States v. Thompson, 146 F.2d 475 (8 Cir. 1944).

*Claim Regarding Cancellation Of Relief Crew*

Somewhat more serious is the government's argument that Lytle's cancellation of the relief crew, after it had been called and had reported for duty at the Albany passenger station, demonstrates that the railroad acted arbitrarily, capriciously and not in good faith. It is this circumstance which makes the case one of first impression and which accounts for the government's having invoked and pressed so vigorously the penalty provisions of the Act.[15]

■ The relevance of the availability of the relief crew turns upon the sufficiency of Lytle's belief, when he ordered the DeWitt crew to return to DeWitt, that there was ample time to get back to DeWitt within the 16 hour period. The Act simply provides a 16 hour limit of on-duty time; it does not require a railroad to attempt to shorten that time to a lesser period. Hence, assuming that the railroad must exercise diligence to prevent service in excess of 16 hours even on the part of the crew of a wrecking train, the cancellation of the relief train is without significance if Lytle in fact acted in the good faith belief that the DeWitt crew had ample time to get back to DeWitt within the 16 hour period when he ordered the crew to return to DeWitt.

Sometime prior to noon, Lytle informed conductor Pietro and brakeman Cimino that he had cancelled the relief crew because the DeWitt crew would have plenty of time to clean up the wreck, handle their cars and get back to DeWitt. At about 1:30 P.M., after more griping by the crew, Lytle told Pietro and Cimino "to get on the outfit and get out of town", that they "had plenty of time to take the train to DeWitt." At 1:30 P.M., when Lytle gave the order to return to DeWitt, there remained 2½ hours before the 16 hour period would expire at 4:01 P.M. Pietro testified that normally it required 1 hour and 30 or 50 minutes to make the run between DeWitt and the scene of the wreck. The Court holds that at the time Lytle ordered the DeWitt crew to return to DeWitt he acted in the good faith belief that there was ample time to get back to DeWitt within the 16 hour period.

■ Lytle's good faith belief at 1:30 P.M. as to the ample time available for the crew to get back to DeWitt is not affected by the fact that the crew actually took a considerably longer time to get there—due in part to an hour's delay by the crew in getting started (because of continued griping), in part to the necessity of traveling slowly with crippled cars and in part to being sidetracked at Rome to permit one or more trains to pass. Certain of these causes of the longer time taken by the crew to get back to DeWitt may have been foreseeable, others were not. The Court holds, however, that, in ordering the crew to return to DeWitt at a time Lytle believed allowed them ample time to get there before the expiration of the 16 hour period, Lytle acted in good faith; and, hence, the foreseeability of the delay is irrelevant. In short, under the wrecking train proviso of the Act, the Court holds that the railroad need not

15. 45 U.S.C. § 63 (1964).

show that the delay was unforeseeable, but only that its agent acted in good faith.

The Court's conclusion in this respect is borne out by a comparison of the language of the two exemptive proviso clauses of the section of the Act here involved.[16] The first proviso (not here invoked) exempts a railroad "in any case of casualty or unavoidable accident or the act of God; [or] where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employee at the time said employee left a terminal, and which could not have been foreseen."[17] The second proviso (here invoked) simply states that "the provisions of said sections shall not apply to the crews of wrecking or relief trains."[18] Obviously, upon the face of the statute, the element of foreseeability of delay is present in the first proviso but is absent from the second proviso.

 Moreover, this distinction is recognized in the cases construing the two provisos, although more cases have arisen under the first proviso than under the second. Thus, the first proviso does not exempt a railroad from doing all that is reasonably within its power to limit the hours of service despite the occurrence of one of the events enumerated in that proviso. Atchison, T. & S. F. Ry. Co. v. United States, 244 U.S. 336, 343 (1917). For example, a delay caused by the necessity of entering a siding to permit a through train to pass, when the need to do so could have been foreseen, does not permit the railroad to avail itself of the first proviso. United States v. Kansas City Southern Ry. Co., 202 Fed. 828, 833–834 (8 Cir. 1913). The purpose of the second proviso, on the other hand, in exempting wrecking crews is to grant flexibility to a railroad in coping with a wreck in view of the emergency nature of work performed by wrecking crews; but the second proviso does not apply unless an emergency ex-

ists and the work of the crew is related to it. United States v. Thompson, 146 F.2d 475, 478 (8 Cir. 1944). The second proviso has been held applicable to an operation similar to that involved in the instant case of bringing a wrecking train to the scene of the wreck, removing the wreck, transporting crippled cars from the scene of the wreck and returning the wrecking train to its terminal. United States v. Thompson, supra.

*Summary*

What this case boils down to, briefly stated, is a construction of the wrecking train exemption, which Congress carved out of the limitation upon on-duty hours of railroad employees, in practical application to the emergency which confronted the railroad with a wreck blocking its main line tracks at St. Johnsville, New York, during the night and following day of December 6–7, 1965.

 Until the derailed cars were removed and service restored on the main line tracks, lives and property were in jeopardy. Moreover, the Court takes judicial notice of the fact that at the time of this wreck the railroad's main line tracks through central New York state were being utilized as a key artery in the Nation's transportation system for the movement of troops and supplies toward Vietnam and Southeast Asia where the United States was involved in armed conflict. Any prolonged interruption in the movement of such troops and supplies would jeopardize the national safety to no less a degree than a strike at the plant of a key defense industry.[19]

 Confronted with such an emergency, the railroad was required to act swiftly and efficiently, utilizing its available manpower in a manner best calculated to clear its main line tracks and to restore service in the shortest possible period of time. This is precisely the situation in which Congress intended, by the wrecking train exemption in the stat-

16. Supra note 1.

17. Id.

18. Id.

19. See, e. g., United States v. The Avco Corporation, 270 F.Supp. 665, 671 (D. Conn.1967).

ute, to entrust to the railroad a margin of managerial judgment. The Court holds, upon the facts here disclosed, that the railroad acted well within that margin of managerial judgment.

This is not to say that the wrecking train proviso affords the railroad an automatic exemption from the on-duty hours limitation of the statute, and that the railroad may avail itself of that exemption by overworking a crew under circumstances found to be arbitrary, capricious and not in good faith. But this is not such a case.

Granted that there was a certain amount of gamesmanship engaged in by the DeWitt crew and by Lytle in the operations of this wrecking train crew, it is not primarily the function of the Court in a proceeding under this statute to arbitrate the merits of such a dispute. Having had an opportunity, however, to observe the demeanor of those witnesses who testified and to apply the recognized tests in judging credibility,[20] there is not the slightest doubt on the part of the Court, all circumstances considered, that Lytle, confronted with a difficult dilemma involving a rebellious wrecking train crew, acted diligently in attempting to limit the on-duty hours of the DeWitt crew despite the wreck; and, specifically, in cancelling the relief crew after it had been called and had reported for duty, Lytle acted in the good faith belief that the DeWitt crew had ample time to get back to DeWitt within the 16 hour period. The Court's holding on the issue of good faith would be otherwise if it had found that Lytle's cancellation of the order for the relief crew was intended as punishment, even for a rebellious wrecking crew that had been giving him the business throughout the day; in balance and upon the entire record, there is no basis for such a finding.

In short, the Court holds, upon the facts of this case, that, while the essential purpose of the Hours Of Service Act is to be subserved by according it a construction which will be remedial, humane and in the public interest, the unambiguous exemptive language of the wrecking train proviso must be here applied to exempt the railroad in order to give effect to the intent of Congress expressed in that proviso.

## ORDER

ORDERED, that the Clerk of this Court enter judgment dismissing the complaint with costs to defendant.

20. See Lomartira v. American Automobile Insurance Company, 245 F.Supp. 124, 131 (D.Conn.1965), aff'd, 371 F.2d 550 (2 Cir. 1967); Westchester Fire Insurance Company v. Tantalo, 273 F.Supp. 7 (D. Conn.1967); Rosner v. Modern Maid Packers, Inc., 274 F.Supp. 685 (D.Conn.

1967); United States v. Feudale, 271 F. Supp. 115, 119 (D.Conn.1967); Pickett v. Nelseco Navigation Company, 270 F. Supp. 682, 683 (D.Conn.1967); Locke Manufacturing Companies v. United States, 237 F.Supp. 80, 89 (D.Conn.1964).