(C.D. 4385)

INTERNATIONAL SEAWAY TRADING CORP. *v.* UNITED STATES

(Decided October 5, 1972)

*Sharretts, Paley, Carter & Blauvelt* (*Eugene F. Blauvelt* of counsel) for the plaintiff.

*Harlington Wood, Jr.*, Assistant Attorney General (*Steven P. Florsheim*, trial attorney), for the defendant.

*Lamb & Lerch* (*David A. Golden* of counsel), amicus curiae.

RICHARDSON, Judge: This case involves the construction of certain exclusionary language appearing in the first inferior heading under the third superior heading of Schedule 7, Part 1, Subpart A, TSUS, covering rubber and plastics protective footwear, which reads:

> Hunting boots, galoshes, rainwear, and other footwear designed to be worn over, or in lieu of, other footwear as a protection against water, oil, grease, or chemicals or cold or inclement weather, all the foregoing having soles and uppers of which over 90 percent of the exterior surface area is rubber or plastics (*except footwear with uppers of nonmolded construction formed by sewing the parts thereof together and having exposed on the outer surface a substantial portion of functional stitching*). . . . [Emphasis added.]

The merchandise at bar consists of insulated rubber woodmen's boots which were exported from South Korea between May and August of 1968, and classified in liquidation under TSUS item 700.53 as "Other" at 37.5 percent ad valorem. And it is alleged in the complaint at bar that the boots should be classified at 11 percent ad valorem under TSUS item 700.55 which reads as follows:

> Other footwear (except footwear having uppers of which over 50 percent of the exterior surface area is leather) :
> > *Having uppers of which over 90 percent of the exterior surface area is rubber or plastics* (except footwear having foxing or a foxing-like band applied or molded at the sole and overlapping the upper) . . . . [Emphasis added.]

The imported boots, composed of rubber, are formed by placing a number of differently shaped pieces of rubber material upon a textile boa (lining) which has been stretched tight upon a metal last. While most of the rubber pieces adhere to the boa either by means of a self-adhering quality (tackiness) or by means of an adhesive applied to them before being mounted on the last, some of the pieces comprising the upper portion of the boot are stitched together before

placement upon the boa. [It is this phase of the process, namely, the stitching in the upper that remains visible in the finished boot, which centers the present controversy.] When all of the pieces of rubber are fully assembled on the last the last is inserted into an autoclave where the boot is vulcanized. And after vulcanization, the boot is trimmed, inspected, and packed for shipment.

Irwin I. Berman, plaintiff's vice-president in charge of foreign operations who has spent some time in Korea observing the production of the imported boots, was called as a witnes on plaintiff's behalf. Mr. Berman testified, among other things, that he has done some experimenting with the boot himself, and has found that the stitching serves the function of preventing the back stay from being pulled away from the boot under pressure, as when the upper is turned down. But William Gottlieb, vice-president in charge of manufacturing of The Servus Rubber Company, called as a witness on defendant's behalf, testified on the basis of his experience with the domestic manufacture of an insulated rubber boot said to be comparable to the imported boot that "vulcanization holds the upper together", that stitching did not add strength to the imported boot, and that this boot was formed by vulcanization. To the same effect was the testimony of Frederick R. Funk, vice-president and treasurer of La Crosse Rubber Mills Company, a domestic manufacturer of rubber, canvas, and plastic footwear, who was also called as a witness on behalf of the defendant.

Among the exhibits put in evidence is a sample of a woman's black vinyl boot, identified as defendant's exhibit A, which, according to the marking on the sole, was made in Japan. At the instance of the defendant leave was given by the court at the trial for the introduction of such evidence into the record as an aid to the court in determining the type of footwear that the exclusionary language in question was intended to cover (R. 51–55). And in this connection the witness Berman, called as a witness on defendant's behalf, testified that plaintiff imported a boot similar to exhibit A, and that he knew how such a boot as exhibit A was made—stating that "the vinyl is cut, parts are sewn together, and the sewn parts are then pulled over a last. The insole is laid on the last prior to the parts being pulled over the last, and a molded outsole is then adhered to it." Mr. Berman said that he did not know whether the boot was put into an autoclave.

Plaintiff argues that the imported boots come within the exclusionary clause because they have uppers of nonmolded construction formed by sewing the parts thereof together, and have exposed on the outer surface a substantial portion of functional stitching. Defendant and amicus curiae argue to the contrary, contending that plaintiff's proofs do not satisfy the requirements of the exclusionary language.

An exception clause in a statute must be strictly construed in accordance with the legislative purpose underlying the statute. *Canadian Pac. Ry. Co.* v. *United States*, 73 F. 2d 831, 834 (C.C.A. 9, 1934). The exclusionary clause in issue here was not part of the predecessor item 700.50 when it was first proposed by the Tariff Commission whose report also recommended that all item 700.50 merchandise be subject to the American selling price basis of valuation (see Tariff Classification Study, Schedule 7, pages 2 and 3). The proposed item 700.50 classification threatened to embrace certain types of plastic footwear, among others, within a provision designed to be "protective" to the domestic rubber footwear industry in line with Presidential Proclamation No. 2026, dated February 1, 1933 [47 Stat. 2552], which increased the duties on imported rubber-soled and rubber footwear pursuant to section 336 of the Tariff Act of 1930. Consequently, this state of affairs evoked protests from Canadian and Japanese plastic (vinyl) protective footwear manufacturing interests who felt that their products were being improperly threatened by the proposed item 700.50 classification. The Canadian product was described as seamless, and "molded in one seamless ply, or one seamless outer ply and a lining ply", and the Japanese product was described as a cold weather boot composed of rubber sole with vinyl upper, and said to be more like leather than rubber. Both of these foreign interests sought to have their respective vinyl protective footwear products excluded from the potential application of item 700.50 classification, contending that these products posed no threat to domestic rubber footwear because they were not competitive with domestic rubber footwear. (Tariff Classification Study, First Supplemental Report, pages 265–272.)

At the hearings conducted by the Tariff Commission on the First Supplemental Report to the Tariff Classification Study it was pointed out to the Commission that the vinyl footwear products are "sewn, cemented and stitched, or molded, but are not vulcanized." Also, at the hearings the Commission extended an invitation to the representative of the Japanese interests to suggest to the Commission language which would insure the exclusion of the footwear represented by samples placed before the Commission from the American selling price method of valuation upon their importation into the United States, to which invitation the representative replied in his supplemental brief (Tariff Classification Study, First Supplemental Report, pages 270, 397) :

> If it is determined to amend the revised schedules to insure that these particular products only do not incur the American selling price basis for duty, this can be done simply by defining them in terms of the functional stitching of the upper, which is characteristic of leather-type footwear.

The Commission responded to the representations put forth by the Canadian and Japanese vinyl protective footwear interests, in its First

Supplemental Report, by making the following revisions in Schedule 7, Part 1, Subpart A (Tariff Classification Study, First Supplemental Report, pages 70–71):

REFERENCE No. 5 – Vol. 2, pp. 527, 528; Vol. 9, pp. 2, 3:

In line 1 of headnote 3(b) of part 1A (footwear of rubber or plastics) delete "in items 700.50 and 700.60" and insert "in item 700.50, if wholly or in part of natural rubber, and in item 700.60" in lieu thereof.

Item 700.50: At the end of the product description for this item insert the following: "(except footwear with uppers of non-molded construction formed by sewing the parts thereof together and having exposed on the outer surface a substantial portion of functional stitching)".

Explanation: A Canadian producer protests the proposed treatment in item 700.50 of protective waterproof footwear in that, under headnote 3(b) of part 1A of schedule 7, the American selling price basis of valuation would be potentially applicable to certain vinyl waterproof footwear as well as to that of rubber. This producer believes that a considerable potential market can be developed in the United States particularly in types, patterns, and fittings typically Canadian in character and which are not being made by U.S. manufacturers, and requests that "slush molded vinyl plastic protective footwear with soles and uppers of a one-piece seamless construction" continue to be outside the scope of the American selling price basis of valuation.

Representatives of importers and Japanese producers have also raised the aforementioned issue relating to vinyl waterproof footwear . . . .

\* \* \* \* \* \* \*

The foregoing change made in headnote 3(b) would preserve the existing administrative interpretation which excepts from American selling price basis of valuation protective footwear of synthetic rubber or plastics dutiable under paragraph 1537(b), by similitude. However, the Commission, in the process of bringing the various comparable types of footwear together in each of the tariff descriptions involved, has also removed from the American selling price principle certain dissimilar types potentially subject thereto. The foregoing change with respect to item 700.50 is an example of language intended to insure that certain dissimilar footwear with supported vinyl uppers (samples of which were introduced at the hearing on the proposed Supplemental Report) would not become subject to valuation on the basis of American selling price.

In its Second Supplemental Report the Tariff Commission changed headnote 3(b) to read, "in item 700.50, if the rubber portion thereof is wholly, or over 50 percent by weight, of natural rubber, and in item 700.60". This was done, according to the report, to avoid extension of the American selling price basis of valuation to certain footwear

wholly or in chief value of synthetic rubber, or of plastics, then dutiable by similitude at the rate applicable to footwear wholly or in chief value of natural rubber under paragraph 1537(b) of the 1930 Tariff Act (Tariff Classification Study, Second Supplemental Report, page 5).

The foregoing constitute the relevant changes made in Schedule 7, Part 1, Subpart A, as of the time when TSUS became effective in 1963. Subsequently, Congress, under the Tariff Schedules Technical Amendments Act of 1965, made additional changes in these provisions in response to requests from the domestic rubber protective footwear industry to extend the American selling price principle to synthetic rubber protective footwear of foreign origin [79 Stat. 945]. Under this Act Congress deleted the amendment of headnote 3(b) which had been made by the Tariff Commission in its Second Supplemental Report as aforesaid. And at the same time Congress also struck out item 700.50 as amended by the Commission in its First Supplemental Report as noted herein, but retained its exact language as an *inferior heading* under which Congress inserted three new item numbers, namely, items 700.51, 700.52, and 700.53. Item 700.51, which provides for protective footwear "Having soles and uppers of which over 90 percent of the exterior surface area is polyvinyl chloride, whether or not supported or lined with polyvinyl chloride but not otherwise supported or lined", thus became the umbrella from the American selling price principle for the Canadian molded vinyl waterproof footwear that had been stripped of the protection afforded it by headnote 3(b) before its amendment by Congress under the 1965 Technical Amendments Act. In proposing these changes, the Senate Finance Committee report stated (2 U.S. Cong. & Admin. News '65, pp. 3434–3435) :

> . . . the committee has added a section to the bill to insure that the American selling price valuation applies alike to waterproof footwear, whether they be of natural or synthetic rubber or of plastics material. An exception is made, however, for overshoes more than 50 percent by weight of unsupported polyvinyl chloride. This type of overshoe is distinguishable from other types and generally does not compete with the more substantial, supported types. Accordingly, this type of overshoe would not be treated under American selling price valuation.

The foregoing constitutes the pertinent legislative history of Schedule 7, Part 1, Subpart A, TSUS, as it relates to rubber and plastics protective footwear. And this history clearly shows that the Congress had no intention by means of these provisions of excluding rubber protective footwear from the application of the American selling price principle which is characteristic of the inferior heading in issue, and also that Congress has attempted to plug any loophole by

means of which such products could escape the American selling price valuation upon their importation into the United States, while at the same time permitting certain types of noncompetitive imported plastics protective footwear to escape such treatment. Thus the legislative history conclusively reveals that the exclusionary language in issue was intended to apply only to protective footwear with uppers comprised of nonmolded vinyl the parts of which are sewn together in a manner simulating the construction of the uppers in leather boots. Defendant's exhibit A is an example of such footwear possessing uppers that respond to the exclusionary language. And the evidence in the instant record only serves to place the instant merchandise outside of the scope of that language since it establishes that the uppers in the footwear at bar are formed by *vulcanization*, whereas the exclusionary language is intended to describe footwear whose uppers are formed by *sewing* and *stitching* and not by *vulcanization*.

The instant merchandise, with its stitching up most of the back of the outer back stay of the boot and its molding around the eye stays, simulated moccasin, the rubber trim which forms the top line and the kicker just above the heel, does not come within the exception provided for in the exclusionary language of the tariff provision which is the center of controversy.

Therefore, on the instant record the court finds and holds as a matter of law that the imported footwear in this case does not fall within the language of the exclusionary clause contained in the inferior heading covering rubber and plastics protective footwear. And it follows that the complaint herein must be dismissed.

Judgment will be entered herein accordingly.